UNITED STATES of America, Appellee,

v.

Ralph PRINCIPIE et al., Appellants.

Nos. 155, 156 and 213, Dockets 75–1175, 75–1176 and 75–1177.

United States Court of Appeals, Second Circuit.

Argued Sept. 19, 1975.

Decided March 4, 1976.

Jay Gregory Horlick, Brooklyn, N. Y. (Zerin, Cooper & Horlick, Brooklyn, N. Y., on the brief), for appellant Principie.

William Sonenshine, Brooklyn, N. Y. (Evseroff & Sonenshine, Jeffrey A. Rabin, Robert I. Weiswasser, Brooklyn, N. Y., on the brief), for appellants Labriola and Slomka.

Robert J. Erickson, Atty., Dept. of Justice, Washington, D. C. (David G. Trager, U. S. Atty., E. D. N. Y.; Shirley Baccus-Lobel, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before MOORE, FEINBERG and OAKES, Circuit Judges.

FEINBERG, Circuit Judge:

Paul Labriola, Dawn Slomka and Ralph Principie [1] appeal from convictions after a non-jury trial in the United States District Court for the Eastern District of New York, Mark A. Costantino, *J.*, of conspiracy to forge and utter United States savings bonds stolen from the mails in violation of 18 U.S.C. §§ 371, 495, 1708 (all three appellants), and forgery of United States savings bonds in violation of 18 U.S.C. § 495 (Labriola). Labriola was sentenced to two concurrent five-year terms of imprisonment and a $5,000 fine; Principie to four years' imprisonment; and Slomka to three years' imprisonment, suspended on condition that she place herself in a community program. All three appellants argue that their convictions must be reversed because much of the evidence against them was the product of electronic surveillance which was unlawful in a number of respects, and should have been suppressed. 18 U.S.C. §§ 2515, 2518(10)(a). We affirm.

## I

### Facts

Appellants were charged in November 1973 along with nine co-defendants, five of whom have since pleaded guilty, in a 26-count indictment with various counts of forging United States savings bonds and uttering them as true, possession of such

---

1. The proper spelling of appellant Principie's name is unclear from the record before us. The district court record generally refers to "Principe," while the briefs in this court use "Principie." We adopt the latter as presumably his own preference. As will be seen, the proper appellation of this appellant is a matter of some importance in the case.

bonds stolen from the mails, and conspiracy.[2] The indictment was the product of a lengthy investigation by the District Attorney of New York County. To understand the points raised by appellants, it is necessary to trace the course of that investigation.

In June 1972, an underworld figure informed the District Attorney's office that one Joseph Martino had offered to sell him stolen United States postal bonds. The serial numbers of the proffered bonds showed them to be missing from a New York brokerage firm. Martino had told the informer to call him at a certain telephone number, which was listed in the name of the 1234 Club, and ask for "Paul." Acting at the prosecutor's direction, the informer called Martino at that number. In the ensuing conversation, which was recorded, Martino discussed stolen bonds and made statements indicating the existence of co-conspirators, including someone called "Ralph."

On July 5, 1972, the New York Supreme Court, Larry M. Vetrano, J., issued an order authorizing interception of "the telephonic communications of Joe Martino, his co-conspirators, agents and associates," including "Ralph,"[3] at the 1234 Club number for thirty days. Interception of communications began on July 11. The officers who monitored the wiretap were instructed not to record privileged or social calls, but otherwise to record all conversations involving Joseph Martino, a person then known to

them as "Ralph," anyone who responded to the name of "Paul" and discussed the theft or disposition of securities, or anyone who engaged in conversations about the procurement or disposition of stolen securities. Meanwhile, police officers maintained physical surveillance of the club, in the course of which they learned that Paul Labriola, who had a criminal record involving stolen checks, was a frequent visitor. No later than July 14, the investigators were aware that the "Paul" whose conversations they were recording was not Martino, but Paul Labriola.[4]

On July 27, the assistant district attorney supervising the investigation sought renewal and expansion of the wiretap order. Justice Vetrano issued a new order which named Martino, Labriola and "Ralph," as well as their co-conspirators, agents and associates, as targets of the investigation; extended until September 7 the wiretapping authority contained in the July 5 order; and included a further provision authorizing electronic surveillance ("bugging") of the 1234 Club. The latter aspect of the order was limited not only by the statutory "minimization" provision requiring the officers not to intercept innocent or privileged conversations[5] but also by the additional proviso that conversations taking place after 7:30 P.M. were not to be intercepted.[6] While the police apparently respected the first condition, they ignored the second, and throughout the period during which the club was "bugged," interception

---

**2.** In addition to the conspiracy count, in which all three appellants were named, Labriola was charged in all counts, involving over 500 bonds; Principie in 12 counts; and Slomka in two. All counts other than those on which appellants were convicted were dismissed on motion of the United States Attorney.

**3.** The order referred to "co-conspirators, agents and associates as described and delineated in paragraphs 23 and 24 of the herein incorporated affidavit of Leonard Newman," which paragraphs speak of "Martino, his co-conspirators, agents, associates and 'Ralph'."

**4.** On that date, a conversation between Martino and Labriola was intercepted. Even before that date, calls to "Paul" involving Labriola

had been recorded, but the calls were short and the officers did not compare "Paul's" voice to available recordings of Martino's.

**5.** 18 U.S.C. § 2518(5) provides:

Every order and extension thereof shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . . .
N.Y.Crim.Proc.L. § 700.30(7) is substantially identical.

**6.** The reason for this limitation is not clear from the record, and none of the parties has explained it.

and recording of conversations continued until midnight or later.

The July 27 order was extended on September 11. From about September 1, however, the conspirators moved their headquarters to another club, and no further conversations at the 1234 Club were recorded. On September 27, an order was obtained authorizing wiretapping of a telephone at the new location. This order was the first in which Ralph Principie was named in full, although the officers had known at least since mid-August, and possibly longer, that Principie was the "Ralph" whose conversations they were recording.[7] This order was in turn renewed on October 28, and the authorization finally expired on November 26. Labriola was notified of the electronic surveillance on December 13, but Principie and Slomka never received official notice that their conversations had been recorded, and learned of this for the first time in an informal conversation with an FBI agent at the time of their indictment in November 1973.

Prior to trial, appellants moved to suppress the fruits of the electronic surveillance as illegally obtained. In January and February 1975, the district court held a lengthy evidentiary hearing at which the above facts concerning the investigation were developed. At the conclusion of the hearing, Judge Costantino held that the wiretap evidence was admissible. Although he agreed that appellants had not received timely notice, he held that they had not been prejudiced by the delay. The very brief non-jury trial, at which most of the evidence was stipulated to, followed immediately. Much of this evidence was the product of the challenged eavesdropping.

## II

### Identification defects in orders

Both Labriola and Principie contend that the wiretapping orders in this case were invalid because they were not properly identified in the applications and orders as required by law. Under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20, applications and orders authorizing electronic interception of conversations must include "the identity of the person, if known, committing the offense and whose communications are to be intercepted." 18 U.S.C. §§ 2518(1)(b)(iv), 2518(4)(a). Cf. N.Y.Crim. Proc.L. §§ 700.20(2)(b)(iv), 700.30(2). Labriola argues that he was "known" within the meaning of the statute by July 14, but was not identified in an order until July 27; Principie that he was known by August 17 at the latest, but not fully identified until the order of September 26.

The leading case interpreting the relevant statutory language is *United States v. Kahn*, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). In *Kahn*, an order was obtained authorizing interception of the telephone conversations of *Mr.* Kahn, a suspected bookmaker, and "others as yet unknown." At trial, *Mrs.* Kahn argued that wiretap evidence obtained pursuant to this order could not be admitted against her because she was not named in the warrant. A divided panel of the Seventh Circuit agreed with her that although the Government, at the time the wiretap order was applied for, was unaware of her involvement in the crime under investigation, "careful investigation by the government would [have] disclose[d that she was] probably using the Kahn telephones in conversations for illegal activities," and therefore that she was "known" within the meaning of the statute and should have been named in the application and order. *United States v. Kahn*, 471 F.2d 191, 196 (7th Cir. 1972). The Supreme Court reversed, concluding that

> Title III requires the naming of a person in the application or interception order only when the law enforcement authori-

---

7. As early as late July, the investigators had some reason to believe Ralph Principie was involved in the affair, and had put him under observation. Some time in August, his voice was definitely identified as that of the "Ralph" whose conversations had been recorded, and on August 17, an informer told the police that Principie was involved in the securities thefts they were investigating.

ties have probable cause to believe that the individual is "committing the offense" for which the wiretap is sought. 415 U.S. at 155, 94 S.Ct. at 155, 39 L.Ed.2d at 237.

The rule that a person must be named in an interception order when probable cause exists to believe that he is involved in the crime under investigation has been followed in this and other circuits. *United States v. Chiarizio,* 525 F.2d 289, 291–92 (2d Cir. 1975); *United States v. Donovan,* 513 F.2d 337, 340–42 (6th Cir. 1975), cert. granted, —— U.S. ——, 96 S.Ct. 1100, 47 L.Ed.2d 310, 44 U.S.L.W. 3462 (U.S. Feb. 23, 1976); *United States v. Moore,* 513 F.2d 485, 492–94 (D.C.Cir.1975); *United States v. Bernstein,* 509 F.2d 996, 1001–1002 (4th Cir. 1975), pet. for cert. filed, 43 U.S.L.W. 3637 (U.S. May 27, 1975). Contra *United States v. Doolittle,* 518 F.2d 500 (5th Cir. 1975) (en banc), pet. for cert. filed, 44 U.S.L.W. 3230 (U.S. Oct. 2, 1975).

The Government argues for a different rule. In its view, the statutory language, requiring the identification of the "person [singular], if known, committing the offense" indicates that there is no obligation to name any and all such persons. This argument from the language of the statute is buttressed by the policy argument that once there has been a judicial determination that probable cause exists to believe a crime is being committed and that conversations regarding that crime are being held over a particular telephone, and the principal target of the wiretap is identified, the public interest in privacy has been adequately protected. Requiring more, it is argued, would put police officers between Scylla and Charybdis: If the police omit a suspect and it is later determined that there was probable cause to include him, they violate the statute; if they include someone, and are later found not to have had probable cause, they

also violate the statute (as well as the Constitution).[8]

These arguments, however, are addressed to the wrong forum. As we said in *Chiarizio,* "The legal standard to be applied under [Title III] has been explicitly established by the Supreme Court in *United States v. Kahn,*" 525 F.2d at 292, and we are not free to set a different one. We need not, however, adopt the Government's reading of the statute in order to reject appellants' arguments that the applications and orders here were defective. As to each of them, a holding that the Government was required to do more than it did would go far beyond the holding in *Kahn.*

### Labriola

 Labriola does not contend that he was "known" within the meaning of §§ 2518(1)(b)(iv), 2518(4)(a) when the first wiretap order was issued on July 5. At that time the authorities clearly did not have probable cause to believe that he was involved in the stolen securities conspiracy they were investigating. His contention is only that the Government was required to obtain an amended order as soon as it discovered his identity, even though the first order permitted interception of conversations of co-conspirators of Martino then unknown. Such an amendment is not required by the language of the federal statute, which sets minimum standards for the content of applications for orders and the orders themselves, but does not purport to require amendment when further conspirators are identified.[9] Moreover, the argument that either the federal or the New York statute requires such amendment before expiration or renewal of the order seems inconsistent with the result in *Kahn* and has been rejected in the courts, as to the New York statute authoritatively. *United States v. O'Neill,* 497 F.2d 1020, 1023

---

**8.** This danger is illustrated in the instant case, in which Labriola argues simultaneously that he should have been identified earlier than he was, and that when he finally was named in an order, probable cause was lacking.

**9.** The New York statute does require amendment "as soon as practicable," when evidence of a new crime is discovered. N.Y.Crim. Proc.L. § 700.65(4). But cf. 18 U.S.C. § 2517(5).

(6th Cir. 1974); *People v. Gnozzo,* 31 N.Y.2d 134, 142, 335 N.Y.S.2d 257, 262, 286 N.E.2d 706 (1972), cert. denied sub nom. *Zorn v. New York,* 410 U.S. 943, 93 S.Ct. 1373, 35 L.Ed.2d 610 (1973).

This interpretation leads to an equitable result in this case, for there is every indication that the police attempted to abide by the law. On the first occasion on which the investigators returned to court to report on their findings and request extension of the order, they fully complied with the statutory requirements, naming Labriola as one "known [to be] committing the offense and whose communications are to be intercepted." Moreover, the lapse of time between discovery of Labriola's identity and the application for extension naming him as a suspect was only 13 days, a time period which has been held to conform to the New York statute's requirement, see note 9 supra, of amendment "as soon as practicable" when evidence of crimes not covered by a wiretap order is discovered. *People v. Sher,* 68 Misc.2d 917, 329 N.Y.S.2d 2, 8–10 (Greene Co.Ct.1972) (Werker, *J.*)

*Principie*

■ Principie, unlike Labriola, was identified from the beginning. He argues that the statute was not complied with, however, because he was identified only as "Ralph," both in the initial application, when that was as far as he was known to the investigators, and in at least one renewal after his full name was known to them. His full name was first given in the September 27 order. We have found no reported cases that deal with this somewhat unusual situation. We believe that, in the circumstances of this case, the requirement that interception applications and orders "identify the person . . . committing the offense" was sufficiently complied with. On these facts, in the absence of some showing that the failure to identify Principie more fully was the result of bad faith on the part of the investigating officers, we fail to see how we can find error in admitting into evidence the fruits of a wiretap conducted

under a court order based on a judicial determination that probable cause existed to monitor the conversations of this very defendant, merely because his last name was omitted from the order.

## III

### Probable cause

Labriola argues (1) that there was no probable cause to believe that he was involved in criminal activity when the July 27 order was obtained, and (2) that conversations, including those which were used to show probable cause to name him in the July 27 order, were recorded pursuant to the July 5 order that had no relation to the criminal activities designated in that order.

■ These contentions are easily disposed of. The determination of probable cause with respect to Labriola was based on two conversations intercepted pursuant to the July 5 order. While both conversations are somewhat cryptic and ambiguous, in light of explanations provided in an affidavit from one of the investigating officers concerning the meaning of various terms relating to securities, and the already established probable cause to believe that conversations involving stolen securities would take place on the telephone involved, the affidavit submitted contained sufficient basis for a finding of probable cause. Labriola's argument that the supporting affidavit contains no allegation that the "Paulie" involved in those conversations was Labriola is also without merit. In the first conversation, "Paulie" arranges a meeting with one Leon at a particular location; the affidavit states that surveilling police officers observed Labriola go to that location at the appointed time; in the second conversation, "Paulie" states that "I met Leon tonight." There was clearly sufficient basis in the supporting affidavit to warrant the conclusion that the "Paulie" of the incriminating conversations was Labriola.

■ The argument that conversations were recorded pursuant to the July 5 order

which were beyond the scope of the order is equally without merit. The application described the criminal activity being investigated as "the procurement and disposition of stolen securities," and the order specified the offenses to which the communications would relate as "Grand Larceny in the Second Degree," "Criminal Possession of Stolen Property in the First Degree" and "Conspiracy to commit said crimes." Labriola argues that because the original information leading to the commencement of the investigation involved the sale of stolen postal and industrial bonds, conversations dealing with future thefts of unspecified securities were outside the scope of the warrants. Such conversations clearly were within the scope of the order, however, and the order was drawn with sufficient particularity to meet the requirements of the statutes. 18 U.S.C. § 2518(4)(c); N.Y.Crim. Proc.L. § 700.30(4). As we said in *United States v. Tortorello*, 480 F.2d 764, 780 (2d Cir.), cert. denied, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973), such orders "must be broad enough to allow interception of any statements concerning a specific pattern of crime."

## IV

### Minimization

As noted above, the July 27 order authorized interception of oral communications in the 1234 Club only before 7:30 P.M., and the detectives conducting the bugging systematically ignored this restriction. No conversation seized in violation of the order was the basis for obtaining extensions of the eavesdropping orders, or was used against defendants at trial, because Judge Costantino ordered such evidence suppressed at the pre-trial hearing. Nevertheless, Labriola and Slomka argue that the failure of the officers to abide by the restrictive provision of the July 27 order requires the suppression of all conversations seized pursuant to that order. Whether violation of "minimization" provisions requires such across-the-board suppression or whether those conversations that the order permitted to be seized may be admitted is a question which has divided both the federal and New York courts.

The minimization provision involved in the reported cases is a general requirement that the monitoring officers as far as possible minimize the interception of innocent conversations and limit their listening to communications involving criminal activity.[10] In each case, the police to a greater or lesser extent disregarded the order, listening indiscriminately to conversations involving criminal acts and to ones that were obviously innocent. Some courts have held that only the innocent conversations should be suppressed. The reasoning behind this result was expressed by the Eighth Circuit as follows:

> Clearly, Congress did not intend that evidence directly within the ambit of a lawful order should be suppressed because the officers, while awaiting the incriminating evidence, also gathered extraneous conversations. The non-incriminating evidence could be suppressed pursuant to 18 U.S.C. § 2518(10)(a), but the conversations the warrant contemplated overhearing would be admitted.

*United States v. Cox*, 462 F.2d 1293, 1301 (8th Cir. 1972), cert. denied, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974). This argument is often supported by reference to the law with regard to other sorts of search warrants, which suppresses only seized items not covered by the warrant, but does not require suppression of items properly seized. *United States v. Sisca*, 361 F.Supp. 735, 745 (S.D.N.Y.1973), aff'd on other grounds, 503 F.2d 1337 (2d Cir.), cert. denied, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974); *United States v. King*, 335 F.Supp. 523, 544–45 (S.D.Cal.1971), rev'd on other grounds, 478 F.2d 494 (9th Cir. 1973), cert. denied, 417 U.S. 920, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). Another argument is that across-the-board suppression is unfair-

---

10. Such a provision is required to be included in all eavesdropping orders. See note 5 supra.

ly harsh, since minimization is a difficult task: Seemingly innocent conversations may be in code or underworld slang; conversations which begin with pleasantries may turn eventually to business matters; large conspiracies may involve many participants, some of whom may at first appear uninvolved. *United States v. Sisca*, supra, 361 F.Supp. at 747. See generally also *United States v. LaGorga*, 336 F.Supp. 190, 196–97 (W.D.Pa.1971); *United States v. Mainello*, 345 F.Supp. 863, 874–77 (E.D.N.Y. 1972). Cases adopting this view generally remit the defendant to civil remedies for the interception of innocent conversations. See, e. g., *United States v. Cox*, supra, 462 F.2d at 1302.

The argument against selective suppression is well stated in *United States v. Focarile*, 340 F.Supp. 1033, 1046–47 (D.Md.), aff'd on other grounds sub nom. *United States v. Giordano*, 469 F.2d 522 (4th Cir. 1972), rev'd, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974):

> In this court's opinion the minimization requirement of § 2518(5) would be illusory if it were enforced on an item-by-item basis by means of suppressing unauthorized seizures at trial *after* the interception is a *fait accompli*. Minimization as required by the statute must be employed by the law enforcement officers *during* the wiretap, not by the court *after* the wiretap. . . . Knowing that only "innocent" calls would be suppressed, the government could intercept every conversation during the entire period of a wiretap with nothing to lose by doing so since it would use at trial only those conversa-

tions which had definite incriminating value anyway, thereby completely ignoring the minimization mandate of Title III. A conversation once seized can never truly be given back as can a physical object. The right of privacy protected by the Fourth Amendment has been more invaded when a conversation which can never be returned has been seized than where a physical object which can be returned has been seized.

See also *United States v. Scott*, 331 F.Supp. 233, 246–49 (D.D.C.1971); *United States v. Leta*, 332 F.Supp. 1357, 1360 n. 4 (M.D.Pa. 1971).

■ A third view attempts to reconcile the two lines of authority by distinguishing between blatant violations of the statute, in which no attempt at minimization is made, and cases in which minimization is attempted, but the court concludes that the efforts were inadequate. See *United States v. Focarile*, supra, 340 F.Supp. at 1046.[11]

■ Whatever view we may take of this controversy in the abstract, we note that this case is somewhat different from those discussed above. The police in this case violated not the general, statutorily-required injunction to minimize interception of innocent conversations, but rather a specific aspect of the order prohibiting interception of *any* conversations after 7:30 P.M. This significantly alters the considerations on each side. The Government cannot make the argument that the police were trying in good faith to make delicate judgments about which calls were innocent and which incriminating; the violation of the

---

11. Labriola and Slomka argue that even if the federal law is unclear, we are bound by the decisions of the New York courts interpreting the New York statute, see *United States v. Capra*, 501 F.2d 267, 276 (2d Cir. 1974), cert. denied, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975), which they contend is more restrictive. We reject appellants' characterization of New York law. Although two New York cases have adopted the total suppression remedy, *People v. Holder*, 69 Misc.2d 863, 331 N.Y.S.2d 557 (Sup.Ct. Nassau Co. 1972); *People v. Castania*, 73 Misc.2d 166, 340 N.Y.S.2d 829 (Monroe Co.Ct. 1973), both are lower court decisions. Neither purports to adopt the view that New York has a different and stricter rule than that required by federal law; both rely on *United States v. Scott*, 331 F.Supp. 233 (D.D.C. 1971), and discuss federal as well as state precedents. Moreover, a more recent lower court decision more thoroughly reviews the cases and opts for selective suppression. *People v. Solomon*, 75 Misc.2d 847, 348 N.Y.S.2d 673 (Sup.Ct. Kings Co. 1973). Insofar as we must interpret the New York statute as well as the federal law, we believe it most rational not to interpret the substantially identical statutes differently.

order was by its nature blatant and apparently extensive as well. On the other hand, the most persuasive argument favoring across-the-board suppression does not apply in this case—the district judge here suppressed evidence that could be useful to the Government as well as conversations that were innocent. To that extent, the suppression already ordered should have a deterrent effect. Moreover, we are less inclined to use the drastic remedy of suppressing conversations that were themselves seized legally because other conversations were seized in violation of a minimization order, where the minimization order in question is a limited one whose purpose has never been made clear to us, than we might be in the case of the usual minimization order, which embodies a statutory requirement central to the policy of Title III. In the unique circumstances of this case, we conclude that only those conversations which were seized in violation of the time limitation in the order had to be suppressed.

## V

### 90-day notice

All three appellants argue that the wiretap evidence against them must be suppressed because the Government failed to notify them of the eavesdropping within 90 days after it terminated, as required by 18 U.S.C. § 2518(8)(d) and N.Y.Crim.Proc.L. § 700.50(3). We reject these arguments.

### Principie

The district court denied Principie's motion to suppress wiretap evidence against him on the ground that there was no "showing of actual prejudice to the defendants" from the failure of the police to provide timely notice, citing *United States v. Rizzo*, 492 F.2d 443, 447 (2d Cir.), cert. denied, 417 U.S. 944, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974); and *United States v. Manfredi*, 488 F.2d 588, 601–02 (2d Cir. 1973), cert. denied. 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974).

The courts that have considered the issue have divided over whether the failure to give the statutory post-termination notice

requires suppression of all wiretap evidence without a further showing of prejudice. Holding that no showing of prejudice is required are *United States v. Donovan*, supra, 513 F.2d 337 (6th Cir.), and *United States v. Bernstein*, supra, 509 F.2d 996 (4th Cir.); cf. *United States v. Chun*, 503 F.2d 533, 541–43 (9th Cir. 1974). Contra, *United States v. Bohn*, 508 F.2d 1145, 1148 (8th Cir.), cert. denied, 421 U.S. 947, 95 S.Ct. 1676, 44 L.Ed.2d 100 (1975); *United States v. Iannelli*, 477 F.2d 999, 1003 (3d Cir. 1973), aff'd on other grounds, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975); *United States v. Wolk*, 466 F.2d 1143 (8th Cir. 1972). This court has held that such a showing is required. *United States v. Rizzo*, supra.

Appellant Principie relies heavily on *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), and it may be that that case and its companion, *United States v. Chavez*, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974), both of which were decided after our decision in *Rizzo*, undercut its holding. The argument would be that suppression is required, even without a showing of prejudice, when the provision violated plays a "central role in the statutory scheme," 416 U.S. at 528, 94 S.Ct. at 1832, 40 L.Ed.2d at 360, and that the 90-day notice provision does play such a role. These later Supreme Court decisions were the basis of the holdings in *United States v. Donovan*, supra, and *United States v. Bernstein*, supra, both of which are contrary to our holding in *Rizzo* that prejudice is required. The argument is substantial enough to engender doubt about this aspect of *Rizzo* in the minds of at least two members of this panel who were also members of the panel in that case. However, certiorari has been granted in *Donovan*, —— U.S. ——, 96 S.Ct. 1100, 47 L.Ed.2d 310, 44 U.S.L.W. 3462, and a petition for certiorari is pending in *Bernstein*. Under the circumstances, it seems appropriate at this time to adhere to our prior holding, without full-scale reconsideration either by this panel alone or by the full court in the en banc proceeding that would probably be required. Therefore, Principie's failure to

show that he was prejudiced in any way requires that Judge Costantino's rejection of his suppression motion be affirmed.[12]

Although the rationale discussed above also disposes of the similar claims of Labriola and Slomka, additional considerations also require rejection of their arguments, as set forth below.

### Labriola

Labriola received the written notice mandated by the federal and New York statutes on December 13, 1972. The statutes require written notice "Within a reasonable time but not later than ninety days after the filing of an application . . . which is denied or the termination of the period of an order or extensions thereof." 18 U.S.C. § 2518(8)(d).[13] The last order covering the 1234 Club was issued on September 11. The order was renewed and amended on September 27, to cover a different telephone, because the conspirators had moved their base of operations. This later authorization was again renewed, and expired on November 26. If the 90-day period within which notice is required is counted from this date, the notice to Labriola on December 13 was obviously timely. Labriola argues, however, that the period should com-

mence on September 1, because interception of communications at the 1234 Club pursuant to the July 27 order was voluntarily abandoned by the investigators at about this time. This argument was apparently accepted by Judge Costantino, who ruled that Labriola had not received timely notice, but that the conversations were nevertheless admissible because Labriola had not been prejudiced by the delay.

We believe that the 90-day period should be calculated from November 26. The language of the statute indicates that notice is due 90 days after the "termination of the period of an order or extensions thereof," not 90 days after the police stop monitoring conversations.[14] In this case, the authorization to intercept conversations at the 1234 Club was renewed on September 11, and again, amended to cover a new location, renewed twice subsequently. The investigation continued, and Labriola continued to be named in the orders as a subject of court-authorized wiretapping. To interpret the statute to require notice 90 days after September 1, in these circumstances, would frustrate the evident intention of the statute to defer notice to the end of the investigation, without any justification in policy or the language of the statute.

---

**12.** Once again we reject the argument that the New York statute is to be interpreted as more restrictive than the federal. The only New York decision we have found that held suppression necessary on similar facts without requiring a showing of prejudice is *People v. Tartt,* 71 Misc.2d 955, 336 N.Y.S.2d 919 (Sup.Ct. Erie Co. 1972). But the careful opinion of the court in that case holds that the *federal* statute requires such suppression, following *United States v. Eastman,* 465 F.2d 1057 (3d Cir. 1972), a decision which has since been held not to apply to circumstances like those before us. *United States v. Cafero,* 473 F.2d 489, 499 (3d Cir. 1973), cert. denied, 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974); see also *United States v. Iannelli,* 477 F.2d 999, 1003 (3d Cir. 1973), aff'd on other grounds, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). Although the New York Court of Appeals has referred to *Tartt* without disfavor, *People v. Hueston,* 34 N.Y.2d 116, 356 N.Y.S.2d 272, 276, 312 N.E.2d 462 (1974), the reference is clearly dictum which leaves the question open. See also *People v. Kennedy,* 75 Misc.2d 10, 347 N.Y.S.2d 327, 333 (Greene Co.Ct. 1973); *People v. DiLorenzo,* 69 Misc.2d 645, 330 N.Y.S.2d 720, 728

(Rockland Co.Ct. 1971). In the absence of a more definitive statement of New York law, we cannot interpret the New York statute differently than the substantially identical federal law. See note 11 supra.

**13.** The New York statute is substantially identical. N.Y.Crim.Proc.L. § 700.50(3).

**14.** There was some dispute below about whether the September 11 order can be treated as an extension of the earlier order or was instead a new order, because there was a brief hiatus between expiration of the July 27 order and the obtaining of the renewed authorization, and because the September 11 order did not state that it was an extension. We do not regard these facts as determinative. The September 11 order was clearly part of the same investigation of the same individuals conducting the same criminal enterprise as the July 27 order and in these circumstances must be regarded as an "extension" of the earlier order within the meaning of the statute.

*Slomka*

 Slomka, like Principie, received no formal notice of the interception of her conversations, and did not receive actual notice from the Government until the day the indictment was filed, about a year after the last order expired. Her position is different from his in one crucial respect. Principie was named in all of the eavesdropping orders,[15] and thus post-termination notice to him was mandatory under section 2518(8)(d). Slomka was not named in any of the orders, although some of her conversations were intercepted. Thus, she was only entitled to notice "as the judge may determine in his discretion . . . in the interest of justice." There has been no showing that the determination not to give notice to Slomka, who was apparently a relatively minor participant in the conspiracy, was an abuse of discretion. See *United States v. Rizzo*, supra, 492 F.2d at 447.

Accordingly, the convictions of all three appellants are affirmed.

15. Although he was named incompletely in some, see Part II above, there is no dispute that he is the "Ralph" named in the orders.