**UNITED STATES of America,**

v.

**Zvi GOFFER, et al., Defendants.**

**No. 10 Cr. 56(RJS).**

United States District Court,
S.D. New York.

April 20, 2011.

Michael A. Levy and Santosh S. Aravind, Assistant United States Attorneys, New York, NY, for United States of America.

JaneAnne Murray, Murray Law LLC, New York, NY, for Defendant Craig Drimal.

## MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge:

Before the Court is Defendant Craig Drimal's motion to suppress wiretap evidence obtained by the government during its investigation of Drimal's involvement in an alleged conspiracy to commit securities fraud. Drimal argues that the monitoring agents violated the federal wiretap statute by failing to properly minimize privileged calls between Drimal and his wife and that, therefore, suppression of the entire wiretap is warranted. For the reasons that follow, Drimal's motion to suppress is denied.

## I. BACKGROUND

### A. Facts

The government first obtained court authorization to intercept communications over Drimal's cellular telephone on November 15, 2007.[1] (GX 60–A at 1.) After obtaining this authorization, government agents monitored Drimal's phone for two 30–day periods: from November 16, 2007 to December 15, 2007, and from December 17, 2007 to January 15, 2008. (*See* GX 60.) Over the course of these sixty days, a total of twenty-six agents worked on the wiretap. (*See* GX 20 at 17–18.)

As required by federal law, the court order authorizing the wiretap contained a "minimization provision" that provided, in relevant part:

> Monitoring of conversations must immediately terminate when it is determined that the conversation is unrelated to communications subject to interception. . . . If a conversation is minimized, monitoring agents shall spot check to ensure that the conversation has not turned to criminal matters.

(GX 3501–A at 7.)

Prior to the commencement of the wiretap, the Supervising Assistant United States Attorney (the "Supervising AUSA") traveled to the FBI office where the wiretap was to be monitored and provided the monitoring agents with instructions for the wiretap. (Tr. at 11–13.) The wiretap instructions included the following provisions that are relevant to the instant motion:

> 4. If you listen to every communication occurring over the designated telephone lines, the fruits of your investigation

may be suppressed unless all the communications were pertinent and were not privileged. We *have to establish that we neither listened to nor recorded communications we had no right to overhear.* . . . "Minimization" requires that the agents and officers make a good faith determination of whether or not each communication is relevant to . . . illegal activities.

> \* \* \*

> 7. You should listen to the beginning of each communication only so long as is necessary to determine the nature of the communication and, in any case, no longer than a few minutes unless the communication is "pertinent," that is, within the scope of our authorization. . . . If *you determine that the communication is not a Criminal Communication, turn the machine off.*

> \* \* \*

> *PATTERNS OF INNOCENCE*

> 10. If, after several days or weeks of interception, we have learned that communications between one or more of the TARGET SUBJECTS and a particular individual or individuals are invariably innocent, non-crime related matters, then a "pattern of innocence" exists and such communications should not be recorded, listened to, or even spot monitored, once such an individual has been identified as a party to the communication.

> \* \* \*

> *Husband–Wife*

---

**1.** The following facts, which are undisputed, are taken from the transcript of the March 9, 2011 hearing and the exhibits submitted by the parties. Citations to "GX" refer to exhibits the government offered at the March 9, 2011 hearing or submitted with its post-hearing brief. Citations to "DX" refer to exhibits Defendant offered at the March 9, 2011 hearing or submitted with his post-hearing brief. Citations to "Tr." refer to the transcript of the March 9, 2011 hearing held in this matter.

20. There is also a privilege concerning communications between spouses. You are to discontinue monitoring if you discover that you are intercepting a personal communication solely between husband and wife. If it appears that a third person is present during this communication, however, the communication is not privileged. So, too, if the communication deals not with private matters between husband and wife, but instead with ongoing as opposed to past violations of law, it is not a privileged communication.

(GX 20 at 2–4, 6, 10 (emphasis in original).)

During the 60 days that the wiretap was in effect, agents intercepted approximately 180 calls between Drimal and his wife. (*See* GX 30.) None of these calls provided agents with any incriminating evidence relating to the charges in this case. To the contrary, the Drimals' marital conversations dealt almost exclusively with personal and family matters. Indeed, in several calls agents listened as the Drimals carried on discussions of a deeply intimate nature. The government does not plan to introduce any of the spousal calls into evidence at trial.

### B. Procedural History

On January 21, 2010, a grand jury returned a ten-count indictment charging Drimal and six co-defendants with, *inter alia*, conspiracy to commit securities fraud. (Doc. No. 43.) On November 30, 2010, Defendants jointly moved to dismiss the indictment and to suppress the wiretap evidence that agents obtained during their investigation. (Doc. No. 113.) On January 5, 2011, the Court denied this motion in part and reserved on the issue of whether the minimization of calls between Drimal and his wife, and between Defendant Zvi Goffer and his wife, was performed in compliance with Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510, *et seq.*[2]

On March 9, 2011, the Court held a suppression hearing to determine whether, in monitoring privileged calls between Drimal and his wife, the monitoring agents demonstrated a "high regard for the right of privacy and [did] all they reasonably could to avoid unnecessary intrusion" into the privacy of their targets. (Scheduling Order, Feb. 16, 2011, Doc. No. 134 (quoting *United States v. Tortorello*, 480 F.2d 764, 784 (2d Cir.1973)).)[3] At the hearing, the Court heard testimony from several of the monitoring agents as well as the Supervising AUSA. Following the hearing, the parties were permitted to submit supplemental briefing, and the motion was fully submitted on March 22, 2011.

### II. APPLICABLE LAW

Title III provides that every court order authorizing a wiretap "shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5).

---

**2.** Following the January 5, 2011 Order, Defendant Zvi Goffer declined to advance this motion as it related to spousal communications between himself and his wife. Although Goffer subsequently attempted to join in Drimal's motion as an aggrieved party, the Court found that Goffer lacked standing to make such an argument and, on March 9, 2011, denied the motion with respect to Goffer. (*See* Tr. at 4:19–5:25.)

**3.** While, as the government noted at the hearing, the standard articulated in *Tortorello* has been clarified by the Supreme Court's decision in *Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), it is undisputed that the government's own wiretap instructions included this language, which remains good law in the Second Circuit. (*See* Tr. 81:8–82:5; GX 20 at 11.)

In *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), the Supreme Court addressed Title III's minimization requirement and articulated an "objective reasonableness" standard for determining whether monitoring agents acted in compliance with the statute. *Id.* at 136–37, 98 S.Ct. 1717 (finding that the existence of a minimization violation "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time"). The Court stressed the fact-intensive nature of such an inquiry:

> Because of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case. The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to "minimize" the interception of such conversations. Whether the agents have in fact conducted the wiretap in such a manner will depend on the facts and circumstances of each case.

*Id.* at 139–40, 98 S.Ct. 1717. The Court cautioned against "blind reliance on the percentage of nonpertinent calls intercepted," explaining that the focus should instead be on "the circumstances of the wiretap":

> [I]t may be important to determine at exactly what point during the authorized period the interception was made. During the early stages of surveillance the agents may be forced to intercept all calls to establish categories of nonpertinent calls which will not be intercepted thereafter. Interception of those same types of calls might be unreasonable later on, however, once the nonpertinent categories have been established and it is clear that this particular conversation is of that type. Other situations may arise where patterns of nonpertinent calls do not appear. In these circumstances it may not be unreasonable to intercept almost every short conversation because the determination of relevancy cannot be made before the call is completed.

*Id.* at 140–41, 98 S.Ct. 1717.

■ Courts applying *Scott's* objective reasonableness standard have evaluated the government's minimization efforts "in the context of the entire wiretap, as opposed to a chat-by-chat analysis." *United States v. Menendez,* No. 04 Cr. 219(DAB), 2005 WL 1384027, at *3 (S.D.N.Y. June 8, 2005). " '[T]he mere fact that every conversation is monitored does not necessarily render the surveillance violative of the minimization requirement of the statute.... [N]o electronic surveillance can be so conducted that innocent conversation can be totally eliminated.' " *United States v. Salas,* No. 07 Cr. 557(JGK), 2008 WL 4840872, at *6 (S.D.N.Y. Nov. 5, 2008) (quoting *U.S. v. Bynum,* 485 F.2d 490, 500 (2d Cir.1973)). Indeed, courts have found that minimization "is generally inapplicable to calls of less than two minutes in duration because they are 'too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation.' " *Menendez,* 2005 WL 1384027, at *3 (quoting *United States v. Capra,* 501 F.2d 267, 275–76 (2d Cir.1974)).

■ The government has the burden of showing compliance with the minimization requirements of Title III. *See United States v. Rizzo,* 491 F.2d 215, 217 n. 7 (2d Cir.1974). "Once a prima facie showing is made, the burden shifts to the defendant to show that, despite a good faith compliance with the minimization requirements, a substantial number of non-pertinent conversations have been intercepted unreasonably." *United States v. Rajaratnam,*

No. 09 Cr. 1184(RJH), 2010 WL 4867402, at *27 (S.D.N.Y. Nov. 24, 2010).

### III. DISCUSSION

Drimal argues that the government violated Title III and the wiretap authorization order by intercepting and improperly minimizing "scores of marital communications between Mr. Drimal and his wife, ... some of a particularly intimate and personal nature." (Def.'s Mem. at 1.) Because these conversations were privileged spousal communications, Drimal asserts, the government was not permitted to intercept them absent probable cause that Mrs. Drimal played a role in the alleged criminal conduct under investigation. Drimal further argues that once these calls were intercepted, the government failed to minimize the conversations in compliance with Title III.

### A. Interception Of Marital Conversations

Drimal's argument that the government failed to take "basic and reasonable steps to ensure that marital communications were never intercepted" (*id.*), rests on the premise that, absent probable cause to believe that both parties to a privileged conversation are involved in criminal activity, any interception of a privileged call is unlawful. Courts interpreting Title III, however, have found no such per se bar to the interception of privileged calls.

Section 2517 of Title III provides that "[n]o otherwise privileged wire, oral, or electronic communication intercepted in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character." 18 U.S.C. § 2517(4). As previously noted, Title III further provides that every wiretap "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). While the case law interpreting these provisions in the context of privileged conversations is limited, courts addressing the issue have generally found that the monitoring of privileged calls is subject to the same reasonableness standard that applies to non-privileged calls.

Judge Gleeson, for example, recently analyzed the minimization requirements that Title III imposes on privileged calls. *See United States v. Simels,* No. 08 Cr. 640(JG), 2009 WL 1924746 (E.D.N.Y. July 2, 2009). Emphasizing the plain language of Title III, Judge Gleeson noted that "the statute expressly contemplates that privileged communications will be intercepted, and provides that such communications ... shall not lose their privileged character." *Id.* at *5. Under this reasoning, there is no per se bar to *monitoring* privileged calls as long as the agents' minimization of such calls is conducted in a reasonable manner. Of course, to the extent that these conversations retain their privileged character, they are not admissible as evidence. The fact that such communications are ultimately inadmissible, however, does not mean that their monitoring constitutes a violation of Title III.

Other courts that have addressed this issue have employed similar reasoning. For example, a panel of the Fifth Circuit affirmed a district court's finding that agents monitoring a defendant's privileged calls did not violate Title III where such monitoring lasted "only long enough to determine that the doctor and lawyer were not participating in the conspiracy." *United States v. Hyde,* 574 F.2d 856, 870 (5th Cir.1978). Similarly, in *United States v. Loften,* 507 F.Supp. 108 (S.D.N.Y.1981), Judge Goettel found unpersuasive the defendant's "somewhat novel argument that it is prima facie improper to even listen to conversations between an attorney and another person, unless there is probable

cause for believing that the attorney is committing illegal acts." *Id.* at 111. Again, in *United States v. DePalma,* 461 F.Supp. 800 (S.D.N.Y.1978), Judge Sweet stressed that, "[a]s with all other interceptions under Title III, the minimization requirement with regard to [privileged] conversations is violated only if monitoring of such conversations is unreasonable under the circumstances." *Id.* at 821.

Drimal, for his part, cites no authority for the proposition that Title III requires agents to determine, before ever monitoring a privileged call, that there is probable cause to believe that both parties to the call are involved in the conduct under investigation. Instead, the only case law cited by Drimal regarding the "crime-fraud exception" to privileged communications discusses the *admissibility* of purportedly privileged evidence that was seized during a search of the defendant's home. (*See* Def.'s Mem. at 6–7 (citing *United States v. Jacobs,* 117 F.3d 82, 87 (2d Cir.1997)).) Such authority is inapposite here, where the government does not seek to introduce the marital communications into evidence.

In any event, Drimal's articulation of the requirements of Title III is contrary to the plain language of the statute. Title III does not prohibit the government from monitoring "communications not otherwise subject to interception," but only requires that agents "minimize" the interception of such conversations. 18 U.S.C. § 2518(5). Accordingly, the Court declines to read into Title III a heightened requirement that applies to the interception of privileged communications.

### B. Reasonableness Of The Agents' Minimization Efforts

■ Even though the Court finds that the government agents were not per se prohibited from monitoring Drimal's spousal conversations, the Court may still find a Title III violation that warrants suppression if the monitoring agents failed to comply with the statute's minimization requirements. *See id.* As noted above, whether agents have complied with Title III's minimization requirements is evaluated through an "objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time." *Scott,* 436 U.S. at 136, 98 S.Ct. 1717.

■ After reviewing the testimony and evidence presented at the hearing, as well as the calls themselves, the Court finds that several of the marital conversations were improperly minimized. In advance of the suppression hearing, the Court highlighted 18 conversations that were potentially violative of Title III's minimization requirement. (Scheduling Order, Feb. 16, 2011, Doc. No. 134.) Of these calls, three stand out to the Court as particularly egregious. In call 5808, for example, the agent monitored almost four minutes of a six-and-a-half minute call while Drimal and his wife had a deeply personal and intimate discussion about their marriage. Call 5809 was obviously a continuation of the private conversation initiated in call 5808—it was placed less than a minute after call 5808 ended—however, the monitoring agent listened to the entire 19-second call without minimizing. In call 5828, the agent monitored, without minimizing, as Drimal listened to a 52-second message from his wife in which she discussed, in detail, intimate aspects of their relationship. At the hearing, the agent who monitored these calls provided no credible explanation for his failure to minimize after it became clear that such conversations were privileged and non-pertinent. The Court is deeply troubled by this unnecessary, and apparently voyeuristic, intrusion into the Drimals' private life.

Several other calls, while not as egregious as those discussed above, also raise questions about the sufficiency of the agents' minimization efforts. Call 5710, for example, was a 93–second conversation that was not minimized, even though it was clear from very early in the call that the discussion was about the Drimals' children. In call 5806, the monitoring agent, who began monitoring while the call was in progress, listened to the last 49 seconds of a non-pertinent conversation that was obviously a marital spat. In calls 5874 and 5875, the agent listened, minimizing only once per call, while the Drimals carried on discussions of patently non-pertinent subjects such as their children and home renovation projects. In call 5945—a conversation that the monitoring agent later "kick[ed][him]self" for not minimizing—the Drimals had a 95–second conversation about their children. (Tr. at 161:3–6.)

As these eight calls illustrate, for at least portions of the wiretap, the government failed to take appropriate steps to ensure that unnecessary intrusions into the private lives of its targets were kept to a minimum. While the majority of these calls were not particularly lengthy—indeed, most were under two minutes—in each of these calls it should have been apparent within seconds that the conversation was privileged and non-pertinent. As the Court stressed at the hearing, given the deeply personal nature of several of these conversations, the agents' failure to

minimize was nothing short of "disgraceful."[4] (Tr. at 206:3–7.)

As a sanction for the government's failure to properly minimize several marital conversations, Drimal seeks suppression of "all calls intercepted over the Drimal wiretap, or, at the very least, the calls intercepted during the first month, when the most egregious intrusions occurred." (Def.'s Mem. at 2.) Drimal argues that, because the government does not seek to introduce any of the marital conversations at trial, "exclusion of the challenged calls [alone] would be no sanction at all." (*Id.*)

■ However, the fact that several of the more than 1,000 intercepted calls were not properly minimized does not automatically entitle Drimal to blanket suppression of the wiretap. Rather, suppression is an appropriate remedy only where the agents' minimization efforts *as a whole* were not objectively reasonable. *See Scott,* 436 U.S. at 136–37, 98 S.Ct. 1717. Even in cases where a defendant is able to make such a showing, it is far from clear that he would be entitled to suppression of anything more than the offending calls.[5]

The Second Circuit has not definitively resolved the question of whether the government's violation of Title III's minimization requirement warrants total suppression of the wiretap or mere suppression of the offending calls. *See United States v. Principie,* 531 F.2d 1132, 1140–41 (2d Cir. 1976). As a general matter, however, district courts in this Circuit have favored the

---

4. The government "does not dispute that several calls between Drimal and his wife were improperly monitored." (Gov't's Mem. at 12.) Accordingly, the government has represented that the United States Attorney's Office "is assembling a committee of supervisory AUSAs to review all aspects of [the] Office's practices concerning the supervision of wiretaps. One focus of that committee's work will be to review and revise the minimization instructions given to monitors." (*Id.* at 9 n. 5.)

5. Title III also provides civil remedies for individuals alleging a failure by the government to properly minimize intercepted conversations. 18 U.S.C. § 2520; *see United States v. Principie,* 531 F.2d 1132, 1140 (2d Cir.1976) (noting that courts "generally remit the defendant to civil remedies for the interception of innocent conversations"); *United States v. Cox,* 462 F.2d 1293, 1302 (8th Cir. 1972).

approach of suppressing only the improperly minimized calls. *See United States v. Pierce*, 493 F.Supp.2d 611, 636 (W.D.N.Y. 2006) ("Even if the investigating agents failed to use reasonable efforts to minimize particular intercepted communications as [the defendant] claims, suppression of all communications intercepted pursuant to any of the challenged Intercept Orders is not the proper remedy absent a pervasive disregard of the minimization requirement." (internal quotation marks omitted)); *United States v. King*, 991 F.Supp. 77, 92 n. 16 (E.D.N.Y.1998) ("To the extent that there are certain calls that should have been minimized, the better approach would be to suppress those particular calls."); *United States v. Orena*, 883 F.Supp. 849, 855 (E.D.N.Y.1995) ("[A]lthough neither the Supreme Court nor the Second Circuit has squarely addressed this issue, several courts have held that a failure to minimize interceptions requires suppression only of the unauthorized interceptions and not of all conversations ... overheard pursuant to the court-authorized surveillance.").

The government relies heavily on *De-Palma*, a case with facts the government finds "remarkably similar to those present in the instant case." (Gov't Mem. at 3.) In *DePalma*, Judge Sweet evaluated the adequacy of the minimization procedures employed by agents who monitored over 12,000 conversations as part of an investigation into racketeering and securities fraud. After finding that agents failed to properly minimize nine privileged calls, Judge Sweet suppressed only the offending calls, finding the defendants' requested sanction of total suppression to be "drastic and excessive, given the number of interceptions, the number of demonstrated violations and the nature of human error." 461 F.Supp. at 823. While noting that the government's nine transgressions were "serious," the court was "left with the conviction that proper minimization standards were observed by the Government" when viewed in the context of the 12,000 conversations intercepted pursuant to the wiretap. *Id.*

Turning to the wiretap in this case, the Court reiterates that, with respect to at least the three most egregious calls identified above, the agent's failure to minimize was "disgraceful" and "an embarrassment generally." (Tr. at 206:3–7.) Nevertheless, viewing the wiretap as a whole, the Court cannot find that the government's conduct was so unreasonable that it warrants the "drastic and excessive" remedy of total suppression. *DePalma*, 461 F.Supp. at 823. First, the government's most egregious failures occurred in the early stages of the wiretap, when agents were presumably still learning to recognize the voices of Drimal's interlocutors as well as identify their patterns of conversation.[6] Further, at the hearing agents presented evidence that, at some unspecified time after the commencement of the wiretap, Mrs. Drimal's telephone number was posted at the monitoring station with instructions that calls to or from this number be minimized. (Tr. at 106:3–107:9; 146:4–17.) As the wiretap progressed, agents began consistently minimizing Drimal's spousal calls within the first ten seconds of the conversation.[7] (*See* GX 30.) Whatever

---

6. Of the 18 calls identified by the Court prior to the suppression hearing, 13 were intercepted in the first 11 days of the wiretap. (*See* GX 30.)

7. Significantly, the agent responsible for the three most egregious failures described above, which all occurred on November 26, 2007, showed dramatic improvement as early as November 30, 2007 the next shift in which he monitored a spousal conversation. Indeed, in the five shifts following November 26, 2007, the agent consistently minimized spousal calls within the first ten seconds of the conversation. (*See* GX 30–FL.)

the cause of this dramatic improvement in identifying and minimizing privileged calls, it weighs in favor of excusing failures that occurred in the early stages of the wiretap. *See Scott,* 436 U.S. at 141, 98 S.Ct. 1717 (noting that interception of a category of calls that is reasonable during the "early stages of surveillance" may be "unreasonable later on ... once the nonpertinent categories have been established").

▮ Having reviewed the wiretap in its entirety, the Court is persuaded that in the vast majority of calls the government's monitoring of the Drimals' spousal communications was reasonable. As the government notes, *every* conversation between Drimal and his wife lasting two minutes or longer was at least partially minimized. (*See* Gov't's Pre–Hr'g Mem., February 2, 2011, Doc. No. 127, at 1; GX 30; DX A.) Given that the wiretap instructions were silent on the amount of time that an agent was permitted to listen to a privileged call prior to minimizing, the agents' conduct was, on the whole, not unreasonable. This conclusion is further supported by case law suggesting that, as a general matter, calls under two minutes need not be minimized. *See Capra,* 501 F.2d at 275–76. To be sure, several of these calls were so obviously non-pertinent that the monitoring agent should have minimized the call regardless of any ambiguity contained in the wiretap instructions. However, these isolated violations are insufficient to demonstrate the type of "pervasive disregard of

the minimization requirement" that would warrant total suppression. *See Pierce,* 493 F.Supp.2d at 636.[8]

Given the wiretap's scope and the substantial manpower needed to sustain it, the Court concludes that, on the whole, the wiretap was professionally conducted and generally well-executed. The agents, while engaging in nearly round-the-clock monitoring, completed contemporaneous line sheets that were forwarded on a daily basis to the Supervising AUSA, who reviewed them in real time before providing periodic reports to the supervising court on the progress of the wiretap. (Tr. at 14:19–15:8; 26:2–27:4.) These periodic or "10–day reports" provided summaries of the most pertinent calls as well as tables setting forth the total number of calls and identifying how many were pertinent and non-pertinent, how many exceeded two minutes, and how many were minimized. (*See* GX 60A–E.) Notwithstanding the serious deficiencies reflected by the interception of the calls discussed above, it would be difficult to review the entire wiretap in context and conclude that the monitoring, on the whole, was other than professional, thorough, and reasonable. *See United States v. Uribe,* 890 F.2d 554, 557 (1st Cir.1989) (when assessing the reasonableness of agents' minimization efforts, the "government is held to a standard of honest effort; perfection is usually not attainable, and is certainly not legally required").[9]

---

8. The Court also has no basis to find, as Drimal urges, that government agents violated Title III by "spot monitoring" calls after identifying them as privileged conversations. Drimal makes much of the "VoiceBox" technology that purportedly notified agents when the target phone received a new call via "call waiting," thus obviating the need for spot checking once agents minimized a privileged call. However, pursuant to the wire instructions, agents were directed to "[c]ontinue to spot monitor as the circumstances indicate."

(GX 20 at 5.) Drimal has cited no authority to support his position that Title III prohibits the spot monitoring of a privileged conversation, and the Court declines to announce such a bright-line standard today.

9. Drimal cites only one case in which a court has ordered suppression of an entire wiretap as a result of the government's failure to minimize privileged conversations. (*See* Def.'s Mem. at 5 (citing *United States v. Renzi,* 722 F.Supp.2d 1100, 1118 (D.Ariz.2010)).)

Accordingly, the Court finds that the government's isolated failures to minimize spousal calls, though inexcusable and disturbing in themselves, do not warrant the drastic and extreme sanction of total suppression.

## IV. CONCLUSION

For the reasons stated above, Drimal's motion to suppress wiretap evidence is denied. The Clerk of the Court is respectfully directed to terminate the motion located at docket number 113.

SO ORDERED.

To the extent that the holding in *Renzi* is not merely aberrational, it is distinguishable from the facts of this case. In *Renzi*, the court found that the government either "illegally recorded" or "unreasonably intercepted" 40 of the 52 conversations between the defendant and his attorneys. *Id.*, at 1110. Here, by contrast, out of the approximately 180 calls between Drimal and his wife, and the 1,000 calls monitored throughout the entire wiretap, the government failed to comply with Title III's minimization requirement in no more than eight instances.