UNITED STATES of America, Appellee,

v.

Thomas FURY and John Quinn, Appellants.

Nos. 738, 716, Dockets 76–1506, 76–1512.

United States Court of Appeals, Second Circuit.

Argued Feb. 8, 1977.

Decided April 27, 1977.

Certiorari Denied June 27, 1977.
See 97 S.Ct. 2978.

States District Court for the Eastern District of New York (Pratt, D. J.). They each pleaded guilty to the charge of conspiracy to transport stolen motor vehicles in interstate commerce in violation of 18 U.S.C. § 371 after the District Court denied their motions to suppress.[1] Both were sentenced to three years imprisonment. Quinn is free on bail pending appeal and Fury is serving a state sentence, upon the termination of which the federal sentence will begin.

■ The sole question on appeal is whether the District Court erred in denying the motions of appellants to suppress conversations intercepted in the course of a court-ordered wiretap on appellant Fury's telephone.[2]

David W. McCarthy, Mineola, N.Y. (McCarthy & Dorfman, Mineola, N.Y., of counsel), for appellant Fury.

Evseroff & Sonenshine, Brooklyn, N.Y. (William Sonenshine, Brooklyn, N.Y., of counsel), for appellant Quinn.

Alvin A. Schall, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (David G. Trager, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellee.

Before FEINBERG, GURFEIN and MESKILL, Circuit Judges.

GURFEIN, Circuit Judge:

John Quinn and Thomas Fury appeal from judgments of conviction in the United

## I

The facts do not appear to be in dispute. Pursuant to an investigation into auto thefts, the District Attorney's Office in Nassau County obtained from Justice Altimari, on March 15, 1974, an order for a wiretap for thirty days on the telephone of Myron Schnell in Commack, New York. No renewals or extensions were requested. The wiretap terminated on April 16 and Justice Altimari signed an order sealing the tapes of the intercepted conversation on May 1, 1974.

While the Schnell wiretap was in operation, conversations to which appellant Fury was a party were intercepted. Fury had not been named in the Schnell wiretap order. In July, 1974 he was notified in writing that his conversations had been intercepted during the Schnell tap.

In April, 1974, the Queens County District Attorney applied for a wiretap on Fury's telephone. In support of this application, the District Attorney submitted the affidavit of a New York City detective who had been investigating Fury and others

---

1. A third defendant, Clark Johnston, also sought to suppress the wiretap evidence and pleaded guilty to the same charge, but he has not appealed from his judgment of conviction.

2. A defendant may appeal the denial of a suppression motion after he pleads guilty, where, as here, the government consents to this procedure at the time of the plea. *See United States v. Burke*, 517 F.2d 377 (2d Cir. 1975); *United States v. Faruolo*, 506 F.2d 490, 491 n. 2 (2d Cir. 1974).

with respect to the crimes of grand larceny and criminal possession of stolen property. Also supporting the wiretap application was the affidavit of a Nassau County detective. The detective interpreted certain conversations intercepted during the Schnell wiretap and to which Fury had been a party as indicating criminal activity. The transcripts were attached to the affidavit.

On April 26, 1974, a New York State Supreme Court Justice (Dubin, J.) granted the application and issued the order for a wiretap on Fury's telephone in Queens County. This time Fury was named in the order as a "target" of the tap.

Justice Dubin's order authorized a wiretap for thirty days. Two thirty-day extensions of this order were subsequently obtained and the wiretap ended on July 25, 1974. On July 31, 1974 Supreme Court Justice Leonard Fine issued an order sealing the tapes of the intercepted conversations.

Both Quinn and Fury were overheard during the Fury wiretap. Fury was served with notice of the tap on April 1, 1975 after Justice Dubin had twice postponed the service of notice upon application of the District Attorney. Quinn was never formally notified under the New York statute that his conversations had been intercepted during the Fury wiretap. He was notified, however, on February 20, 1976, by the United States Attorney's Office through his attorney.

## II

Appellants contend that the seizure of Fury's conversations obtained pursuant to the "Schnell order" was illegal, requiring their suppression as well as the suppression of "evidence derived therefrom." With respect to the Schnell tap, they argue: (1) that there was a failure by the monitoring officers during the Schnell wiretap to "minimize" the interception of non-pertinent conversations; (2) that Assistant District Attorney Edward Margolin was not a proper "applicant" under the statute to apply for the wiretap warrant; (3) that the recordings of conversations seized during the wiretap were not timely sealed; and (4) that appellant Fury was not timely served with notice of the wiretap.

Having thus claimed that the Schnell order was invalidly issued and improperly executed, appellants contend that the Fury wiretap, which, as noted, was obtained in part on the basis of conversations intercepted during the Schnell wiretap, should have been suppressed as "fruit of the poisonous tree." See *Wong Sun v. United States*, 371 U.S. 471, 487–88, 87 S.Ct. 903, 17 L.Ed.2d 842 (1963). The Fury wiretap is attacked directly, moreover, upon the following grounds: (1) that it was not established that normal investigative techniques had been tried and failed; (2) that the two extension orders were not supported by "present probable cause"; and (3) that there was untimely sealing and service of notice of the tapes of conversations intercepted during the Fury wiretap.

## III

### A. *Standing*

We agree with the government's contention that Quinn has no standing to challenge the Schnell wiretap. Under both New York State and federal law only an "aggrieved person" has standing to challenge the validity of a wiretap.[3] New York Criminal Procedure Law ("CPL") § 710.20; 18 U.S.C. § 2518(10)(a). An aggrieved person is one who has had his conversations intercepted during the wiretap, or is a person against whom the wiretap was directed. CPL § 710.10(5); 18 U.S.C. § 2510(11).

3. The warrants in this case were issued and executed under the New York Eavesdropping statute, CPL § 700.05, *et seq.* Therefore, their validity must in the first instance, be determined by New York law. *United States v. Rizzo*, 491 F.2d 215, 217 (2d Cir.), *cert. denied*, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1973). However, the New York statute is patterned after the federal wiretap statute, 18 U.S.C. § 2510, *et seq.* *People v. Sher*, 38 N.Y.2d 600, 604, 381 N.Y.S.2d 843, 345 N.E.2d 314 (1976). *See United States v. Principie*, 531 F.2d 1132, 1140 n. 11 (2d Cir. 1976). *But cf., United States v. Manfredi*, 488 F.2d 588, 598 n. 7 (2d Cir. 1973).

■ Quinn was not named in the Schnell wiretap order and he was not a party to any conversation intercepted during that tap. Since he is not an "aggrieved person," he cannot challenge the Schnell tap directly by seeking to suppress information derived from it. In consequence, he cannot challenge it indirectly by seeking to suppress evidence from the Fury tap on the ground that the Fury tap was authorized in part on the basis of information from the Schnell tap. *Wong Sun v. United States*, 371 U.S. 471, 491–92, 87 S.Ct. 903, 17 L.Ed.2d 842 (1963); *United States v. Wright*, 524 F.2d 1100, 1102 (2d Cir. 1975). *See United States v. Tortorello*, 533 F.2d 809, 815 (2d Cir. 1976). But, of course, Quinn has standing to challenge the Fury tap on grounds unrelated to the Schnell tap, since his conversations were overheard during that later tap.

■ Fury, on the other hand, has standing as an aggrieved person to challenge both the Schnell and Fury wiretaps. *See* New York Civil Practice Law and Rules ("CPLR") § 4506(2). Fury does not have standing, however, to raise the issue of improper "minimization" during the Schnell tap. That is because the tap on Schnell's phone and the failure to minimize the conversations intercepted is an invasion of Schnell's privacy, not Fury's. *United States v. Poeta*, 455 F.2d 117, 122 (2d Cir.), *cert. denied*, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972); *People v. Fiorillo*, 63 Misc.2d 480, 481, 311 N.Y.S.2d 574 (Montgomery Cty.Ct.1970). *See Alderman v. United States*, 394 U.S. 165, 171–76, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *United States v. Hinton*, 543 F.2d 1002, 1011, n. 13 (2d Cir. 1976).

Consequently, since neither Quinn nor Fury has standing to raise any claim of failure to minimize the Schnell tap interceptions, we shall not address that contention further.

### B. *Authority to Seek Eavesdropping Order*

Fury's second challenge to the Schnell wiretap order is directed to the application made by the Office of the Nassau County District Attorney. He contends that Edward Margolin, then the Chief Assistant District Attorney, was not a proper "applicant" for an eavesdropping warrant within the meaning of the New York Criminal Procedure Law.

Subdivision 2(a) of CPL § 700.20 states that the application for an eavesdropping warrant must set forth the identity of the "applicant", and must contain a statement of the applicant's authority to make the application. "Applicant" is defined in subdivision 5 of CPL § 700.05 in pertinent part as a "district attorney" or if the district attorney is "actually absent or disabled . . . that person designated to act for him and perform his official function in and during his actual absence or disability."

In the Schnell wiretap application Margolin stated that he was the Acting District Attorney of Nassau County, that the District Attorney was out of the State, and that he was proceeding under the authority of § 702 of the New York County Law (McKinney 1972). At this time there was on file in the County Clerk's Office a memorandum dated June 10, 1974 and signed by the District Attorney which designated, "in order of succession," Margolin and another Assistant District Attorney as "duly authorized deputies or emergency interim successors for the office of District Attorney." The designation was made pursuant to § 2216(3) of the County Government Law of Nassau County (Cum.Supp.1976) providing for the continuity of government in the event of an enemy attack or public disaster. The memorandum indicated it had also been sent to the County Executive and County Comptroller.

Another memorandum, dated April 9, 1971, and addressed to the County Executive, again designated Margolin the "Chief Assistant District Attorney," and two other Assistant District Attorneys as "Acting District Attorneys" and "duly authorized deputies or emergency interim successors." The designation was again made pursuant to § 2216 of the County Government Law of Nassau County (Cum.Supp.1976).

Fury claims that Margolin was not a proper "applicant" under CPL § 700.05(5) because these designations did not comply with the requirements of § 702 of the New York County Law. Subdivision 4 of § 702 requires the District Attorney to "designate in writing and file in the office of the county clerk and clerk of the board of supervisors the order in which such assistant [district attorneys] shall exercise the powers and duties of the office in the event of a vacancy or the absence or inability of such district attorney to perform the duties of the office." The designations in the above memoranda were deficient, according to Fury, because they only mentioned "enemy attack" or "public disaster" and did not specifically state in so many words that the order of succession also applied when the District Attorney "is actually absent or disabled." He notes, moreover, that the second memorandum was not filed with the County Clerk and the Clerk of the Board of Supervisors pursuant to § 702.

▮ Judge Pratt found that the designations in these memoranda were in substan-tial compliance with the requirements of § 702, but held that even if they were not, they constituted a proper designation under CPL § 700.05. We agree.

▮ It is clear that Margolin was "the person designated to act for [the District Attorney] . . . in and during his actual absence," whether or not there was literal or substantial compliance with § 702 of the New York County Law. There is no reason to assume that the only way to comply with § 700.05 is through adherence to the particular requirements of § 702, though we do not doubt that it is useful for the District Attorney to comply. The purpose of the designation provision in § 700.05 is to make sure that the person who does apply for such an order has the authority to make that application, and, as the District Court found, Margolin had that authority. Cf. United States v. Chavez, 416 U.S. 562, 571–73, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974).[4]

## C. Notification of the Wiretaps

Appellants claim that both wiretaps are "unlawful" and should be suppressed be-

---

**4.** Fury also contends that CPL § 700.05 conflicts with 18 U.S.C. § 2516(2) in that the New York statute impermissibly permits delegation of the authority to seek eavesdropping orders to a subordinate in the absence or disability of the district attorney. He claims that Congress did not contemplate that any person other than the attorney general or county district attorney himself would have such authority. As one court which rejected this argument stated, "Congress simply could not have intended that local wiretap activity would be completely suspended during the absence or disability of the official specifically named [in § 2516(2)]." State v. Travis, 125 N.J.Super. 1, 308 A.2d 78, 82 (1973), aff'd, 133 N.J.Super. 326, 336 A.2d 489 (1975).

This conclusion is supported by the legislative history. The Senate Report states that "the issue of delegation by [the Attorney General or District Attorney] would be a question of state law." S.Rep. No. 1097, 90th Cong. 2d Sess. (1968), 1968 U.S.Code Admin.News, pp. 2112, 2187. Fury responds that the statement, also in the Senate Report, that "[t]he proposed provision does not envision a further breakdown" past the Attorney General or District Attorney precludes the delegation in the New York law. However, the delegation in New York is to an "acting" district attorney. This is not a "further breakdown" in the chain of command. There is still only one person who has the authority and he is at the top.

At least one New York court has upheld the New York provision against the same argument advanced by Fury. People v. Fusco, 75 Misc.2d 981, 348 N.Y.S.2d 858 (Nassau Cty.Ct. 1973). We agree that the New York provision comports with the federal wiretap law. The delegation is only made to assure that someone can make the application and it does not change the fact that, like the federal law, the New York law "centralizes in a publicly responsible official subject to the political process the formulation of law enforcement policy on the use of electronic surveillance techniques," 1968 U.S.Code & Admin.News, supra at p. 2185. In this case the District Attorney is responsible for and names his replacement when he is absent. And "should abuses occur, the lines of authority lead to an identifiable person," id., the acting district attorney.

In any case, Fury is barred from asserting this claim now because he failed to assert it in the pre-trial suppression hearing. See United States v. Schwartz, 535 F.2d 160, 163 (2d Cir. 1976); 18 U.S.C. § 2518(10).

cause notification was not made pursuant to CPL § 700.50(3) which requires that within ninety days after the termination of an eavesdropping warrant, notice of the wiretap must be served on the person named in the warrant and such other parties to the intercepted conversation "as the justice may determine in his discretion is in the interest of justice." This section is patterned after 18 U.S.C. § 2518(8)(d).[5]

■ Fury, as to the Schnell wiretap, and Quinn, as to the Fury wiretap, are only entitled to "discretionary" notice because they were not named in the respective orders. On the other hand, Fury was named in the Fury order and he is, therefore, entitled to the ninety-day mandatory notice. So far as the Schnell wiretap is concerned, the failure to notify Fury, who was not named in the order, in timely fashion does not require suppression. *United States v. Donovan*, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). The same is true with regard to the failure to notify Quinn of the Fury wiretap. And with regard to the Fury wiretap, where Fury was *named*, and hence entitled to notice within ninety days of "the termination of the period of an order or extensions thereof," the law in this circuit, as appellants concede, is that failure to give the proper notification will result in suppression of the wiretap evidence only where prejudice is shown, even when notice is "mandatory" under 18 U.S.C. § 2518(8)(d). *United States v. Principie*, 531 F.2d 1132, 1141 (2d Cir. 1976) (named

defendant); *United States v. Rizzo*, 492 F.2d 443, 447 (2d Cir.), *cert. denied*, 417 U.S. 944, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974) (named defendant). *Principie* was decided after *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed. 341 (1974) and *United States v. Chavez*, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974), which held that the Attorney General himself or an Assistant Attorney General had to authorize a wiretap, and that suppression was required in default thereof. We adhered to our prior holding in *Rizzo*, but we wondered whether the grant of certiorari in *United States v. Donovan*, 513 F.2d 337 (6th Cir. 1975), would affect the issue of whether proof of prejudice was relevant.

■ The decision of the Supreme Court in *Donovan* has not given us an altogether clear answer, however. That case involved the failure to give notice to two persons whose conversations had been overheard but who had not been "named" in the order. In such case, it is discretionary with the judge whether to give them notice. 18 U.S.C. § 2518(8)(d). The Court of Appeals ordered suppression of the conversations based upon its reading of *Giordano, supra.* There, as we have noted, the Court decided that authorization by the Attorney General or an Assistant Attorney was essential, on the ground that, based upon the legislative history, such authorization played "a central role in the statutory scheme." 416 U.S. at 528, 94 S.Ct. at 1832. In *Donovan*, the

---

5. Criminal Procedure Law § 700.50(3) states:
"Within a reasonable time, but in no case later than ninety days after termination of an eavesdropping warrant, or expiration of an extension order, except as otherwise provided in subdivision four, written notice of the fact and date of the issuance of the eavesdropping warrant, and of the period of authorized eavesdropping, and of the fact that during such period, communications were or were not intercepted, must be personally served upon the person named in the warrant and such other parties to the intercepted communications as the justice may determine in his discretion is in the interest of justice."
Title 18 U.S.C. § 2518(8)(d) states:
"Within a reasonable time but not later than ninety days after the filing of an application

for an order of approval under section 2518(7)(b) which is denied or the termination of the period of an order or extension thereof, the issuing or denying judge shall cause to be served, on the persons named in the order or the application, and such parties to intercepted communications as the judge may determine in his discretion that is in the interest of justice, as inventory which shall include notice of—
"(1) the fact of the entry of the order or the application;
"(2) the date of the entry and the period of authorized approved or disapproved interception, or the denial of the application;
"(3) the fact that during the period wire or oral communications were or were not intercepted."

Court surveyed the structure of the Act and its legislative history and concluded that "we do not think that postintercept notice was intended to serve as an independent restraint on resort to the wiretap procedure." *United States v. Donovan,* 429 U.S. 439, 97 S.Ct. at 674. We must acknowledge that the actual holding of *Donovan* relates to the class of persons required to be given "discretionary notice" pursuant to 18 U.S.C. § 2518(8)(d), but we think that the reasoning of the Court confirms the view which we expressed in *Rizzo* and *Principie, supra,* that prejudice must also be shown when the notice is said to be "mandatory" within the ninety-day period in the same subsection of the Statute. In sum, while it is desirable for the prosecutors to meet the ninety-day notice requirement, we again hold that a failure strictly to observe the time limitation puts the burden on the defendant to show that he was prejudiced. *See Donovan, supra,* 429 U.S. at 439, 97 S.Ct. at 673 n. 26.

Here Fury received the mandatory notification of the tap on his phone in April, 1975 after two orders were issued by Justice Dubin extending the time for notification. He was notified officially fifteen months before the suppression hearing, and he has not shown prejudice. We need not reach the question, therefore, whether the orders postponing the notice were valid, which, in any event, would make the notice timely.

### D. *"Normal investigative techniques" requirement*

Appellants also contend that the Fury eavesdropping order was improperly issued because the supporting affidavit of Detective Gonzalez did not comply with the re-quirements of subdivision 2(d) of CPL § 700.20.[6]

The Gonzalez affidavit contained the following statement:

"Normal investigative techniques have been attempted in this case. Investigation herein commenced on April 2, 1974 and investigation was conducted on April 3, 4, 5, 9, 10, 11, 15, 16, 17, 19, 22, 23 and 24th. It is very difficult to 'tail' the persons named herein because they are very careful and are constantly changing routes and acting in such a way as to locate surveillance vehicles. We have been able to ascertain that Thomas Fury goes often to an auto parts yard at E. 56th Street and Avenue D in Brooklyn, known as Bergen Auto Parts. This is a fenced in yard wherein the trailer that the 'Goldbug' was placed is located. The 'Goldbug' was an eavesdropping device placed by the Kings County District Attorney's Office Squad which allegedly obtained substantial information about criminal activities of Paul Vario and his associates. Therefore, the persons around this auto parts yard are very careful and very sensitive to Police surveillance."

The District Court determined that the affidavit met the statutory requirements. It noted that the New York court could have reasonably determined that the individuals being investigated were acting cautiously, were sensitive to the potential of a police investigation and that the full scope of the criminal conspiracy, if it existed, could not be determined except by means of electronic surveillance. It also noted that this was a situation where the whole investigation might be aborted if the suspects

---

**6.** That subdivision provides that an application for an eavesdropping warrant must contain:
"A full and complete statement of facts establishing that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ, to obtain the evidence sought. . . ."
The corresponding federal provision is 18 U.S.C. § 2518(1)(c):
"(1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:
\* \* \* \* \* \*
"(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried to be too dangerous;"

were tipped that such an investigation was being conducted.

At the outset we note that the purpose of these "other investigative techniques" requirements "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Pacheco,* 489 F.2d 554, 565 (5th Cir.), *cert. denied,* 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1974); *People v. Holder,* 69 Misc.2d 863, 868, 331 N.Y.S.2d 557 (Sup.Ct. Nassau Cty. 1972). Moreover, the required showing is to "be tested in a practical and commonsense fashion." 1968 U.S. Code & Admin.News, *supra,* at p. 2190. In short, the requirement is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigation techniques would suffice to expose the crime." *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 982, 39 L.Ed.2d 225 (1974).[7]

■■■ The detective's affidavit stated that normal investigative techniques were attempted on thirteen specific dates, that the subjects were "difficult to 'tail'" because they were "very careful and . . . constantly changing routes." The affidavit also noted that Fury often went to a location that had been previously "bugged" successfully and that, as a result, the subjects were especially sensitive to police surveillance. We think these statements amply met the state's burden under CPL § 700.-20(2)(d). *See United States v. Steinberg,* 525 F.2d 1126, 1130 (2d Cir. 1975).[8]

**7.** And the more traditional surveillance techniques need not be exhausted first if they are "impractical" or "costly and inconvenient." *United States v. Robertson,* 504 F.2d 289, 293 (5th Cir. 1974), *cert. denied,* 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975) (undercover agents).

**8.** We consider appellants' claim that the "other investigative techniques" requirement was not met in the two applications for extensions of the Fury tap also to be without merit.

### E. *"Present probable cause" for the extension order of the Fury wiretap*

Appellants claim that there was no "present probable cause" for the renewal order of the Fury tap as required by *Berger v. New York,* 388 U.S. 41, 59, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). *See People v. Gnozzo,* 31 N.Y.2d 134, 141, 355 N.Y.S.2d 257, 286 N.E.2d 706 (1972). Specifically, they argue that the transcripts of the conversations already intercepted during the Fury tap revealed only innocuous, or, at best, ambiguous conversations between Fury and his associates.

■■■ CPL §§ 700.15(3), 700.20(2)(e) and 18 U.S.C. § 2518(1)(d) and (3)(b) provide that a wiretap may issue only upon a showing of probable cause to believe that communications pertaining to the designated offense will be obtained through the wiretap. Moreover, there must be probable cause that an offense has been or is about to be committed. CPL §§ 700.15(2), 700.-20(2)(b)(i); 18 U.S.C. § 2518(1)(b)(i) and (3)(a). This standard of probable cause is the same as the standard for a regular search warrant. *United States v. Falcone,* 505 F.2d 478, 481 (3d Cir. 1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975); *People v. Kaiser,* 21 N.Y.2d 86, 286 N.Y.S.2d 801, 233 N.E.2d 818 (1967), *aff'd sub nom. Kaiser v. New York,* 394 U.S. 280, 89 S.Ct. 1044, 22 L.Ed.2d 274 (1969); *People v. Fusco,* 75 Misc.2d 981, 348 N.Y.S.2d 82 (Nassau Cty.Ct. 1973).

Detective Gonzalez' affidavit interpreted the transcripts of the eight conversations previously intercepted during the Fury tap. He concluded that they all indicated discussion of stolen property.[9] The conversations,

**9.** The affidavit interprets the eight conversations as follows:

"In the first conversation there is a discussion of needing plates which I interpret as needing license plates to transport stolen vehicles. In the second conversation there is discussion relative to one of the persons nicknamed "Sonny" being arrested for possession of stolen truck. In the third conversation, two individuals discuss stolen goods. The fourth conversation regards obtaining clean registrations for stolen vehicles. The fifth conversation represents possession of

while somewhat ambiguous at times, can be reasonably interpreted to indicate what the detective interpreted them to be. Fury's interpretations, on the other hand, are somewhat ludicrous. For instance, Detective Gonzalez interpreted the following conversation to refer to license plates to transport stolen vehicles:

"Fury: I need the plates.

"Joey: When?

"Fury: Right now.

"Joey: Come and get them."

Fury contends that the "reference could very simply have been dinner plates." He also contends that the following statements about "Sonny" who had been arrested for possession of a stolen truck were exculpatory:

"Fury: Oh, that kid is bad, boy.

"John: I don't know what the hell he is doing, *you gotget* [sic] *permission when you take a truck or car, anything.*

"Fury: You better believe it."

(Emphasis added.)

■ Moreover, when the eight conversations are considered in the context of Fury's criminal record, what the investigation had already disclosed (as set forth in the initial affidavit seeking the order), and the conversations obtained under the Schnell wiretap, there is ample demonstration of probable cause.

Appellants' claim is therefore without merit.

### F. *Sealing of the Schnell Tapes*

The most troublesome claims raised by appellants are the last two which relate to the sealing of the Schnell and Fury tapes. Fury contends that the fourteen-day delay in sealing the Schnell tapes rendered the wiretap "illegal" and thus also made the Fury tap illegal because it was obtained "through the exploitation of the original illegality." He claims that the tapes of both wiretaps, therefore, must be suppressed.

The government concedes both that there is no explanation for the fourteen-day delay and that under the appropriate case law, *see United States v. Gigante,* 538 F.2d 502 (2d Cir. 1976), the Schnell tapes would be suppressed from use *at trial or in a grand jury proceeding.* However, it argues, and the District Court agreed, that the tapes may be used to establish *probable cause* for the wiretap order on the Fury telephone.

Subdivision two of CPL § 700.50 requires that "[i]mmediately upon the expiration of the period of an eavesdropping warrant, the recordings of communications . . . must be made available to the issuing justice and sealed under his directions." The government, of course, fully recognizes the State's obligations under this section. The conversations in the Schnell wiretap, if offered as evidence, could have been suppressed under *Gigante, supra.* But here there was no attempt to offer the tapes in evidence. They were "used only in the establishment of probable cause" for another wiretap. The government contends that a failure to seal under § 700.50 does not bar disclosure of the contents of the wiretap tapes when the disclosure is for investigative purposes or to establish probable cause for additional warrants.[10] The only limita-

---

stolen property. The sixth conversation is a cryptic conversation regarding setting up a meeting. The seventh conversation represents selling of stolen merchandise. The eighth conversation represents possession of stolen stereos. In my experience, as a Police Officer each of these conversations represents the discussion of stolen property."

10. This argument is based on the differing language in the first three subdivisions of CPL § 700.65. They state:

"1. Any law enforcement officer who, by any means authorized by this article, has obtained knowledge of the contents of any intercepted communication, or evidence derived therefrom, may disclose such contents to another law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.

"2. Any law enforcement officer who, by any means authorized by this article, has obtained knowledge of the contents of any intercepted communication, or evidence derived therefrom, may use such contents to the extent such use is appropriate to the proper performance of his official duties.

tion on use, it contends, is set out in subdivision three of CPL § 700.65, use or disclosure of the tapes before a grand jury or at trial. It argues, in support of such statutory construction that, otherwise, police officers operating an on-going wiretap would be unable to use the fruits of that tap simply because the tap had not yet ended and the tapes had not yet been sealed.

The government also relies on the legislative history of the federal provisions after which the three subdivisions of the New York statute are modeled,[11] and a District of Columbia Circuit opinion which deals with an analogous provision in the federal statute.[12]

 While the question is not free from doubt, we are persuaded that the view pressed by the government, and accepted by the District Court, is sound. The Schnell tapes, even with the fourteen-day unexplained delay in sealing, provide a proper basis for a finding of probable cause to support the issuance of the Fury wiretap order, even though the Schnell tapes might not have been admissible in evidence.

We note, in any event, that though in *Giordano, supra,* a tape derived from a prior

unauthorized tape was suppressed, this was in the context of the authorization deemed to be central to the statutory scheme. *Giordano* did not deal with postintercept requirements, nor did *Gigante, supra,* deal with the derivative, as distinguished from testimonial, use of tapes which had not been timely sealed.

### G. *Sealing of the Fury Tapes*

Also troublesome is appellants' argument that the Fury tapes were not timely sealed and must therefore be suppressed. Central to this claim is the argument that the sealing provision of the New York statute, CPL § 700.50(2), requires that, if there is an extension of the original order, the tapes must be sealed after each thirty-day period and not after the termination of the final extension of the original wiretap order. In this case that would mean that the Fury tapes would have had to be sealed upon completion of *each* of the three thirty-day periods of the wiretap which resulted from the two extension orders. Since they were not sealed until six days after the termination of the third period, appellants argue that there were sealing delays ranging from six to sixty-three days.

"3. Any person who has received, by any means authorized by this article, any information *concerning a communication, or evidence derived therefrom,* intercepted in accordance with the provisions of this article, may disclose the contents of that communication or such derivative evidence while giving testimony under oath in any criminal proceeding in any court or in any grand jury proceeding; *provided, however, that the presence of the seal provided for by subdivision two of section 700.50, or a satisfactory explanation of the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any communication or evidence derived therefrom.*"
(Emphasis added.) The government notes that only subdivision 3 requires a seal.

11. The Senate Report states as to 18 U.S.C. § 2517(2), the counterpart of CPL § 700.65[2], that the "proposed provision envisions use of *the contents of intercepted communications,* for example, to establish probable cause for arrest . . . [and] probable cause to search. . . ." 1968 U.S.Code Cong. & Admin.News, pp. 2122, 2188. And it states that a seal is "intended to be a prerequisite for use or disclosure under section 2517(3)" (at trial or

grand jury proceeding)—the counterpart of CPL § 700.65[3], *id.,* at 2194, but does not mention the seal requirement with regard to the first two subdivisions (disclosure to other investigative or law enforcement officer and use in performance of one's duties).

12. *See United States v. Johnson,* 176 U.S.App. D.C. 179, 539 F.2d 181 (1976). The court noted that 18 U.S.C. § 2517(5) requires prior judicial approval for use of other-crimes fruits of a wiretap, only where the information is to be offered in testimony at a federal or state proceeding. The court concluded:

"Prior application and approval for this type of use is desirable in order to assure that rights will not be affected by information obtained in violation of the Fourth Amendment or the wiretap statute. The writers of the statute have apparently concluded that the balance of police efficiency with the need for safeguarding personal privacy calls for exclusion of the fruits or illegal seizures from admission at trial, but does not demand routine judicial review prior to that time, at every stage of an investigation."
*Id.,* at 539 F.2d at 187.

The pertinent language requiring sealing is contained in CPL § 700.50(2) and 18 U.S.C. § 2518(8)(a). CPL § 700.50(2) requires sealing "[i]mmediately upon the expiration of the period of an eavesdropping warrant," and 18 U.S.C. § 2518(8)(a) "[i]mmediately upon the expiration of the period of the order, or extensions thereof." The appellants claim that the strict construction mandated by the case law of the sealing provision supports their interpretation. The government responds that this interpretation is contrary to both a plain reading of the statute and basic common sense. It notes, for instance, that the statutes use the phrase "the period" rather than "a period" or "each period" and that this clearly shows an intent to treat an eavesdropping order, together with its extensions, as one continuing period for the purposes of the sealing requirement.

There is really no precedent and nothing in the legislative history of either statute that directly supports appellants' claim. There is, of course, some logic in the proposition that the purpose of the sealing provisions would be better served if the tapes were sealed every thirty days rather than at the end of ninety days. Carried to its ultimate conclusion, however, tampering with the tapes could only be guarded against if they were sealed by a judge at the end of each day. The statute does not require this. Whatever tampering could be done in ninety days could be done in thirty days. As a practical matter, sealing every thirty days would not be a significantly better safeguard than the system used by the Queens District Attorney. In *Gigante, supra,* we were dealing with separate orders by different judges. Here the back-to-back extensions simply continued the *same* wiretap on the same telephone under the *same* warrant. The Fury wiretaps were conducted under a single warrant that was extended by court order.

The intended congruity of the state and the federal statutes is apparent. And we read the New York statute, as we do the federal statute, to make a single "period" "of the period of the order, or extensions thereof," provided that they are consecutive. Any other interpretation would require, in our view, either clearer Congressional language or some more cogent reason of policy than has been presented or that occurs to us. The only apparent authority in point supports the position of the government. *See People v. Mangiaracina,* Indictment No. 5161/73 (Sup.Ct. Kings Cty. July 15, 1976).

■ Since the language of the statutes, the apparently prevailing practice, and what case law there is, supports the position that the government need seal the tapes only after the termination of the extensions of the original order, that is the position we adopt. We note, however, that since it would not be a hardship for the government to seal the tapes after each thirty-day period, it might seriously consider adopting such a practice.

■ This leaves only the question of the six-day delay in sealing the tapes from the end of the final extension. The reason given for the delay is that the State was attempting to have the "issuing justice," as required by CPL § 700.50, seal the tapes. When the District Attorney's Office found out that the Justice was on vacation, they immediately sought another Supreme Court Justice and the tapes were sealed.

We have held that when there is a reasonable basis for the delay, the failure to file an inventory and to seal "immediately" does not compel suppression. *United States v. Poeta,* 455 F.2d 117 (2d Cir.), *cert. denied,* 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972); *United States v. Capra,* 501 F.2d 267, 277 n. 10 (2d Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975). *See Gigante, supra,* 538 F.2d at 506 n. 8; *People v. Carter,* 81 Misc.2d 345, 365 N.Y.S.2d 964 (Cty.Ct. Nassau Cty. 1975); *People v. Blanda,* 80 Misc.2d 79, 362 N.Y. S.2d 735 (Sup.Ct. Monroe Cty. 1974); *People v. Simmons,* 84 Misc.2d 749, 378 N.Y. S.2d 263 (Sup.Ct. N.Y.Cty. 1975).

We think the District Court was correct in its determination that there was a reasonable basis for delay.

Since we find all of appellants' contentions to be without merit, the judgments of conviction are affirmed.