COMMONWEALTH vs. COLEMAN B. WALLACE.

Plymouth.   September 10, 1985. — May 27, 1986.

Present: BROWN, KASS, & WARNER, JJ.

*Controlled Substances.  Evidence,* Wiretap.  *Search and Seizure,* Wiretap,
Probable cause, Affidavit.

In a narcotics case, probable cause for issuance of a warrant authorizing the
wiretap of two telephone lines in the defendant's home was established
by the affidavits of three police officers, where, apart from concededly
inadequate tips from two informants which the motion judge disregarded,
the affidavits stated that, during a periodic seven-year surveillance of
the defendant's home, police officers had observed the defendant and
certain associates engaged in activities consistent with a narcotics oper-
ation, and where, in view of the protracted and continuous nature of
these activities, the events described in the affidavits were not too remote
in time from the application for the warrant. [250-251]

At the trial of a narcotics case, information obtained by police officers exe-
cuting a warrant to wiretap two telephone lines in the home of the
defendant was properly admitted in evidence, even though the police
had continued the wiretap two days beyond the limit of fifteen consecutive
days provided by G. L. c. 272, § 99, where none of the conversations
intercepted during the unauthorized two days was used as the basis for
an application for extending the wiretap or as evidence during the trial,
and where there was no evidence that law enforcement officials had
deliberately ignored the fifteen-day period or that the defendant was
prejudiced by their assumption that the fifteen days did not have to be
consecutive. [251-254]

The fact that police officers applying for an extension of a wiretap order did
not include in the application information obtained during two days of
surveillance following the expiration of the fifteen-day period of the
original warrant as authorized by G. L. c. 272, § 99, did not require
suppression of all information obtained as a result of the renewed wiretap
order, where the results of the original surveillance, apart from the two
unauthorized days, provided a sufficient basis to conclude that probable
cause for a wiretap continued. [254-255]

INDICTMENT found and returned in the Superior Court De-
partment on April 16, 1980.

A motion to suppress evidence was heard by *William G. Young,* J., and the case was tried before *Edith W. Fine,* J.

*Susan J. Baronoff* for the defendant.

*John P. Corbett,* Assistant District Attorney, for the Commonwealth.

BROWN, J. Based principally on evidence obtained from two wiretaps, the defendant was found guilty on several drug charges after a jury-waived trial in the Superior Court. On appeal, the defendant claims that his pretrial motion to suppress the evidence derived from those wiretaps should have been allowed because the warrants for each wiretap were in sundry ways fatally defective.

1. *The First Wiretap Warrant.*

The first wiretap warrant was issued on December 21, 1979. Conceding that the tips from the two informants who implicated Wallace in drug trade were disregarded by the motion judge,[1] the defendant claims that the judge improperly decided that the remaining evidence amounted to probable cause to believe that he and others were engaged in the distribution of controlled substances, and that a wiretap warrant of the two telephone lines of Wallace's residence would lead to the interception of communications evidencing such criminal activity.

A wiretap warrant can only be issued upon a showing of probable cause. The probable cause required for an electronic surveillance search is no different from that which is necessary to obtain a warrant for a physical search. See *United States* v. *Fury,* 554 F.2d 522, 530 (2d Cir.), cert. denied sub nom. *Quinn* v. *United States,* 433 U.S. 910 (1977); *United States* v. *Baynes,* 400 F.Supp. 285, 295 n.17 (E.D. Pa. 1975); *United States* v. *Marcello,* 531 F. Supp. 1113, 1116 (C.D. Calif. 1982).[2] "[T]he overhearing of conversations by means of elec-

---

[1] The Commonwealth concedes the tips described in the warrant application, standing alone, were not sufficient to establish probable cause, but argues that they reinforce the inference drawn from the other facts that Wallace was involved in drug dealing. The motion judge apparently did not rely on the tips at all.

[2] These cases all concerned the issuance of wiretap warrants pursuant to 18 U.S.C. § 2518 (1976), but that statute is similar in form and content to G. L. c. 272, § 99.

tronic surveillance . . . constitutes a 'seizure' within the meaning of the [Fourth] amendment . . . [and] the fourth amendment requires that warrants issue only upon 'probable cause.'" *United States* v. *Dorfman,* 542 F.Supp. 345, 359 (N.D. Ill. 1982) (citations omitted). See also *Katz* v. *United States,* 389 U.S. 347, 351-353 (1967). The analogous State requirement is found in G. L. c. 272, § 99E 2.

Probable cause exists where "'the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Commonwealth* v. *Stewart,* 338 Mass. 747, 749 (1971), quoting from *Brinegar* v. *United States,* 338 U.S. 160, 175-176 (1949). *Commonwealth* v. *Snow,* 363 Mass. 778, 784 (1973). *Commonwealth* v. *Vynorius,* 369 Mass. 17, 23 (1975). The application must be considered as a whole, not in fragments. *Commonwealth* v. *Snow, supra* at 783-784; *Commonwealth* v. *Corradino,* 368 Mass. 411, 416 (1975). Applying these general rules to the present case, we are of opinion that there were sufficient facts and circumstances discernable from the three affidavits submitted in support of the initial application for a wiretap warrant of Wallace's home to establish probable cause.[3]

Of the three affidavits submitted, Sergeant John R. Conroy's was the most extensive. On April 25, 1977, Conroy observed a blue and white aircraft buzz Wallace's home and then land at Cranland Airport. Within ten minutes of this event, Wallace and one Charles Risio rushed, by car, to Cranland Airport. Conroy observed two individuals who were leaving the aircraft area run towards and enter the defendant's car. One of these men carried a large filled paper bag, the other carried a small wooden box. The four men returned to Wallace's residence. Conroy had observed activity between Wallace's home and Cranland Airport on other occasions. See Appendix. Conroy's affidavit also noted that Wallace maintained frequent contact

---

[3] A summary of the affidavits is contained in the Appendix to this opinion.

with various individuals who were known or suspected of being involved in drug trafficking.[4] See Appendix.

In addition, despite the defendant's lack of regular employment, he apparently enjoyed considerable wealth. The defendant was known to have made several trips overseas. He wore extravagant pieces of gold jewelry, and even claimed to be in the business of importing gold jewelry, a business which, it fairly may be assumed, had great start-up costs. He also enjoyed part ownership of a single engine aircraft and had several cars listed in his name.

The defendant and his wife had purchased their house in Hanson at 850 East Washington Street in September, 1972. While the house is located in a rural residential area, it was equipped with bright spotlights which illuminated the surrounding area and was protected by guard dogs.

In assessing the sufficiency of an affidavit, a judge or magistrate may draw reasonable inferences from all the legally competent information submitted within the affidavit. See *Commonwealth* v. *Ellis,* 356 Mass. 574, 578 (1970); *Commonwealth* v. *Anderson,* 362 Mass. 74, 77 (1972). On the basis that there were other possible explanations for the circumstances set out in the affidavits — the frequent trips, the two telephones, and the heavy traffic around his home might instead have been connected to his jewelry business — the defendant argues that probable cause was not shown. Innocent explanations, however, do not vitiate the existence of probable cause where there is a reasonable probability that criminal activity is afoot. *United States* v. *Dorfman,* 542 F.Supp. at 359. We think that the facts presented in the affidavits, together with the inferences which reasonably could be drawn, provide sufficient justification to establish the existence of probable cause.

The defendant makes the further argument that the associations referred to in the Conroy affidavit date back to 1972 and

---

[4] See *Commonwealth* v. *Corradino,* 368 Mass. at 414 n.4 and cases cited, where the court noted that police knowledge of reputation was permitted to be used to substantiate other information in piecing out probable cause.

that little activity took place in 1979. The Hanson police conducted a periodic surveillance of the defendant's home over a seven-year period. The affidavit describes the results of this surveillance and the related police investigation of those persons seen at Wallace's home. While some of the events do date back to 1972, recent activity is also described. Much of the activity between Cranland Airport and Wallace's home took place in 1978. Several associates, specifically Bongarzone, Marconi, Cosman, Reichlin, Carmichael, Fusco, Cedar, Kaufman, and Erving, were reported to be in physical or telephone contact with Wallace in 1979. See *Commonwealth* v. *Ellis,* 356 Mass. at 598 (continuing pattern of behavior noted from continuous surveillance).

The standard for determining staleness is a flexible one. *United States* v. *Marcello,* 531 F.Supp. at 1121. A review of these events discloses a continuing pattern of behavior involving long-standing relationships among these individuals. Contrast *Commonwealth* v. *Reddington,* 395 Mass. 315, 323 (1985), where the affidavit related only a single transaction not of the "protracted and continuous" type "inherent in a large-scale narcotic operation." *Id.,* quoting from *United States* v. *Harris,* 482 F.2d 1115, 1119 (3d Cir. 1973). Where an affidavit recites activity indicating protracted or continuous conduct, time is of less significance. *Commonwealth* v. *Vynorius,* 369 Mass. at 25. Consequently, the events described were not remote from the time of the application for the warrant.

2. *Execution of the First Wiretap.*

Having concluded that probable cause existed to issue the warrant, we turn to the execution of the wiretap order. The warrant authorized interception for "a period not exceeding fifteen days . . . from the date of installation of any device necessary for such interception."[5] The defendant claims the

---

[5] General Laws c. 272, § 99 I, states, in pertinent part, that "[a] warrant must contain the following: . . . The date of issuance, the date of effect, and termination date which in no event shall exceed thirty days from the date of effect. The warrant shall permit interception of oral or wire communications for a period not to exceed fifteen days. If physical installation of a device is necessary, the thirty-day period shall begin upon the date of installation."

electronic eavesdropping illegally extended two days past the authorized fifteen-day period[6] and that as a result all evidence derived therefrom must be suppressed. See G. L. c. 272, § 99 P.[7] This argument is based on language found in *Commonwealth v. Vitello,* 367 Mass. 224, 251 n.15 (1975), wherein the court stated, "§ 99 I provides that the warrant shall permit interception for a *continuous* period not to exceed fifteen days within a thirty-day period" (emphasis supplied). Arguing that the Vitello language is merely dictum, the Commonwealth points out that actual eavesdropping only occurred on fifteen days and that nothing in the statute or warrant compels a requirement that the days be consecutive. We disagree. The court in *Vitello,* noting the obvious legislative intent to carefully restrict wiretap orders (*id.* at 231, 269), concluded that the thirty-day period, which "establish[es] finally the duration of the interception, is necessary to prevent 'the equivalent of a series of intrusions, searches, and seizures pursuant to a single showing of probable cause.'" *Id.* at 274, quoting from *Berger* v. *New York,* 388 U.S. 41, 59 (1967). Adopting the Commonwealth's interpretation, that *any* fifteen days within the thirty-day period is permissible, does not advance that purpose. Further, the installation date, which triggers the thirty-day period during

---

[6] Interception pursuant to the original warrant occurred on January 3, January 5 through January 16, and on January 18 and 19, 1980. Summaries and monitor's logs for all dates *except* January 18 and 19 were submitted to the court with the application for an extension of the warrant and order.

[7] General Laws c. 272, § 99 P, states: "Any person who is a defendant in a criminal trial in a court of the commonwealth may move to suppress the contents of any intercepted wire or oral communication or evidence derived therefrom, for the following reasons:

"1. That the communication was unlawfully intercepted.

"2. That the communication was not intercepted in accordance with the terms of this section.

"3. That the application or renewal application fails to set forth facts sufficient to establish probable cause for the issuance of a warrant.

"4. That the interception was not made in conformity with the warrant.

"5. That the evidence sought to be introduced was illegally obtained.

"6. That the warrant does not conform to the provisions of this section."

which the warrant is effective, is not necessarily the same date as "interception," which occurs when actual eavesdropping begins. G. L. c. 272, § 99 B 4 and I 2.[8] Under the statute, it is interception which triggers the fifteen-day period. An issuing magistrate, as was the case here, may authorize interceptions only for the fifteen days after installation; if the warrant does not so specify, however, the statute does not insist that installation occur and interception begin on the same day. Circumstances which might delay interception, after the necessary device is in place, are easily imaginable.

The authorized period for actual interception was thus January 3 through January 17, 1980, and the interceptions made on January 18 and 19 exceeded the scope of the warrant. That illegality does not, however, taint the legal interceptions made during the first fifteen days after the device was installed. The appropriate inquiry in determining whether a statutory violation of § 99 mandates suppression is whether the requirement which is not satisfied is a "central or functional safeguard to prevent abuses . . .; whether the purpose that the particular procedure was designed to effect has been accomplished in spite of the error . . .; and, whether the statutory requirement was deliberately ignored, and, if so, whether this was done to gain an unfair tactical advantage." *Commonwealth* v. *Vitello,* 367 Mass. at 269-270 (citations omitted). The interceptions made during the first fifteen calendar days were the only ones summarized in the extension application as a basis for renewal; none of the conversations intercepted during the unauthorized period of the first warrant were used at trial. Moreover, there was no evidence that the Commonwealth deliberately ignored the fifteen-day period or that any prejudice flowed from its apparent assumption that the fifteen days did not have to be consecutive.[9]

---

[8] General Laws c. 272, § 99 B 4, states, in pertinent part, that "'interception' means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of an intercepting device."

[9] Cf. *United States* v. *Principie,* 531 F.2d 1132, 1138 (2d Cir. 1976), where the court reasoned that, in the absence of some showing of bad faith

In any event, the statute specifies that the "contents" of intercepted communications may be suppressed if "not intercepted in accordance with the terms of this section." G. L. c. 272, § 99 P 2. The language suggests an analysis of particular interceptions, not a suppression of the entire wiretap.[10] See *Commonwealth* v. *Hall,* 366 Mass. 790, 795-798 (1975) (overhead conversations not considered in probable cause determinations, but also did not taint the entire warrant); *United States* v. *Mainello,* 345 F. Supp. 863, 880-881 (E.D.N.Y. 1972) (suppression of illegal interceptions without effect valid ones). Had the Commonwealth attempted to use the interceptions (if any) made on January 18 and 19, the defendant would have been entitled to have them suppressed. They were not used in any way, and did not affect the validity of the prior interceptions. Cf. *Commonwealth* v. *Hall,* 366 Mass. at 792.[11]

3. *The Application for Extension.*

General Laws c. 272, § 99 J 1, states that an application for the extension of a wiretap order "must set forth the results of the interceptions thus far conducted." Because the interceptions of January 18 and 19 were not summarized (though all the others were) and no monitor logs were included for those dates, the defendant would have us suppress everything derived from the renewed order. He argues that "highly pertinent" information was withheld from the issuing judge. All that was avoided, however, in light of the above discussion, was a needless exercise whereby a motion to suppress could have

---

on the part of the investigating officers, there was no error in admitting in evidence the fruits of a wiretap conducted under a court order to monitor the defendant's conversations merely because his last name was omitted from the order.

[10] Similar concerns have been addressed where minimization requirements in warrants have not been observed. See *Commonwealth* v. *Vitello,* 367 Mass. at 261-262, and especially 264 n.22. See also *United States* v. *Principie,* 531 F.2d at 1139-1141; *United States* v. *Mainello,* 345 F. Supp. 863, 874-877 (E.D.N.Y. 1972).

[11] Applying a similar principle, the court in *Hall* concluded that, when police, with a warrant to search a second floor apartment, also searched a third floor owned by the same person, evidence found in the second floor was properly seized but drugs found on the third floor had to be suppressed.

been filed and allowed as to the content of interceptions for those two days. G. L. c. 272, § 99 P. The results of the other days' surveillance provided a sufficient basis to conclude that probable cause continued, and that further surveillance would in fact ascertain the scope of the alleged narcotics conspiracy. The renewal provision, like its Federal analog, is meant "to permit the court realistically to appraise the probability that relevant conversations will be overheard in the future." *United States* v. *Giordano,* 416 U.S. 505, 532 (1974). That purpose was fulfilled here.

*Judgment affirmed.*

### Appendix.

The application for the original warrant to conduct electronic surveillance of the defendant's home was supported by three affidavits. The affiants were Officers Conroy, Meiggs, and Worrall. The following is a summary of those affidavits.

I. *The Conroy Affidavit.*

Conroy's affidavit was based in part upon information about Wallace's associates. Conroy began his investigation of 850 East Washington Street in Hanson after being told by a United States marshal in September, 1972, that the marshal had observed several males on the premises whose demeanors were consistent with drug involvement. Conroy learned that the home was purchased by Wallace and his wife, Sari, in September, 1972. Conroy received a complaint from a Hanover pharmacist that Sari Wallace had submitted prescriptions on several occasions in 1974 for unusually large amounts of controlled substances. The prescriptions were issued by Dr. Lozano of Franklin, Massachusetts. Dr. Lozano was later arrested and convicted in 1976 on several counts of violating G. L. c. 94C.

A. *Wallace's Associates.*

Conroy also related the following information about Wallace's association with other persons. Surveillance was complemented with background checks of those persons observed visiting Wallace.

1. *Charles F. Risio, Jr.* Risio was convicted of possession and sale of controlled substances in 1969. In September, 1976, William Tobin, a former Plymouth District Court probation officer, told Conroy that Risio, a truck driver and student, was a close friend of Wallace and involved with Wallace in the illegal distribution and sale of controlled substances. In March, 1977,

a State trooper told Conroy that Maine State police had a warrant for Risio's arrest for auto theft conspiracy, and auto insurance fraud. Also, while in the State of Maine, Risio had listed his address ad 850 East Washington Street, Hanson, Massachusetts (Wallace's home).

Vehicles registered or rented to Charles and Karen Risio were observed at 850 East Washington Street once in 1973, once in 1974, once in 1975, once in 1976, seven times in 1977, and five times in 1978.

On September 25, 1977, a Rockwell Commander aircraft landed at Cranland Airport in Hanson. Risio and a woman left the aircraft, entered a vehicle that had been parked at the airport for several days, and drove directly to 850 East Washington Street. This vehicle had Florida license plates and was registered to Karen Risio.

Conroy also related that Risio and Wallace jointly acquired a Cessna aircraft in July 1977. They sold it in May, 1978. Then current FAA records listed Risio as the owner of a single engine Beechcraft Debonaire.

2. *Donald A. Silvia.* A motorcycle registered to Silvia was observed at 850 East Washington Street in August, 1975. Silvia was also observed at the premises in 1976 and 1977. Maine State police told Conroy that Silvia used 850 East Washington Street as a home address while in Maine in 1977.

In 1977 Silvia rented a cottage in Tenant's Harbor, Maine, where telephone records were found showing several calls to both of Wallace's telephone lines in June and July, 1977. Calls were also placed from Wallace's phones to the cottage. Maine State police suspected Silvia of involvement in drug smuggling in 1977.

On March 13, 1979, Silvia and another man, Michael Nervi, were arrested upon a belief of marihuana smuggling. At the time they were driving a tractor trailer lined with plastic, a practice which Conroy states is employed by those transporting marihuana. Silvia was found in possession of guns, ammunition, tear gas, a plastic bag with marihuana, a plastic bag with cocaine, and one plastic bag with twenty-two pills.

3. *Anthony Francis Bongarzone.* Vehicles listed to Bongarzone or his business were observed at Wallace's home once in 1975, twenty-five times in 1977, and five times in 1978. Numerous calls were also placed from both of Wallace's telephone lines to Bongarzone's phone in 1977 through to 1979.

In 1969 Bongarzone was arrested for the unlawful possession of narcotics; in 1971 he was again arrested for narcotics violations; in 1972 he was arrested for possession of a class B controlled substance and conspiracy to violate the controlled substance law; and in May, 1978, he was arrested for uttering and forging in connection with unlawfully obtaining prescription drugs. In late 1977, a vehicle belonging to a suspected drug dealer was seen at Bongarzone's home.

4. *Elaine Dodge.* Dodge's car was observed at Wallace's home in November 1975. She was arrested on heroin charges twice in 1978.

5. *Stephen P. Carfagna.* Carfagna's automobile was seen at Wallace's home three times in 1976, and once in 1977. He was arrested for possession of cocaine in 1976.

6. *Thomas Marconi (aka Thomas Wax).* Marconi was observed entering or leaving Wallace's home three times in 1976, twice in 1977, and once in 1979. He was once arrested for speeding and gave 850 East Washington Street as his home address.

In 1973 Marconi was convicted of possession of class B and class D controlled substances.

In September, 1976, William Tobin related to Conroy that Marconi was a street dealer of marihuana and cocaine, and a runner or "mule" for Wallace. In October, 1976, Tobin told another Hanson police officer, that he, Tobin, was acquainted with an associate of Wallace, and that Wallace was engaged in marihuana and cocaine distribution; Tobin gave the officer a page torn from his personal address book listing Wallace's associates. In October, 1977, several calls were made to a telephone number listed to Marconi and billed to Bongarzone from Wallace's phones. A drug enforcement agent told Conroy that in July, 1979, Marconi attempted to sell one pound of cocaine to an undercover agent, although actual delivery was not made.

7. *Victor L. Trawick.* Trawick was arrested for possession of marihuana in 1972. In September, 1977, an automobile registered in his name was observed at Wallace's home. From an informant who had provided reliable information in the past, Conroy learned that Trawick and his wife were involved in cocaine with a person identified as "Coley" from the South Shore area ("Coley" was a nickname of Coleman Wallace). Telephone company billings confirmed that calls had been placed from Trawick's phone to Wallace's several times in 1977.

Trooper Begin of the Massachusetts State police reported that on January 18, 1977, he observed Trawick, Wallace and a third unidentified man at Bongarzone's place of business. A reliable informant (whose information had led to arrests for cocaine distribution on at least two prior occasions) said that he had been in Trawick's company in both Massachusetts and Florida; that Trawick had admitted being associated with Donald Silvia and Michael Nervi in the transportation of drugs from Florida to New England. (See par. 2 above.)

In March, 1978, Trawick was observed at a security check point at Logan Airport. At that time Trawick's bag was opened because it was seen to contain a large quantity of money. An informant related that Trawick was carrying approximately $55,000 in cash. Trawick boarded a flight to Florida.

In April, 1978, the informant told Trooper Johanson of the State police, who related to Conroy, that Trawick had returned from Florida with a quantity of cocaine. Pursuant to a search warrant, several clear plastic bags were found with one plastic bag with white powder residue, two scales, approximately 200 one-ounce vials with covers and a passport in the name of Victor Trawick with a stamp indicating a trip to Brazil on January 12, 1977.

8. *Kenneth P. Cosman.* Vehicles registered to either Cosman or his wife were observed, between 1975 and October, 1979, at the Wallace residence many times, often three or more times per week. These vehicles had also been present at Cranland Airport when Wallace's airplane was arriving or departing.

9. *Bernard Ledwell.* Ledwell's car was observed at Wallace's residence on December 25, 1977. Maine police had had Ledwell under surveillance since August, 1977, and in September, 1977, observed him shining flood-lights on the waterway for two days before the seizure of the ship Juliana I, which was carrying forty tons of marihuana at the time. He also admitted to a Maine undercover police officer that he had been waiting for a load of marihuana, and said, upon learning of the seizure, "That's what I'm here for. I have got to contact my boss."

10. *Arnold Reichlin.* Reichlin's car (registered in New Jersey) was observed at Wallace's home seven times in 1977 and eleven times in 1978. He had been arrested in 1971 in Poughkeepsie, New York, on drug charges. Telephone company records indicated frequent contact between Wallace and Reichlin from 1977 through 1979.

11. *Robert Kane.* Kane was convicted in 1969 for possession of narcotics. His car was seen twice at Wallace's home in 1977. In 1978, the police found Kane's two Florida phone numbers in an address book taken from John Fusco and Joyce Carmichael (Par. 12 below). Telephone company records show numerous calls from Wallace's residence to Kane's Florida phones in 1977 and 1978.

12. *John Fusco and Joyce Carmichael.* Fusco and Carmichael were arrested on March 5, 1978, just after leaving the Wallace residence. Fusco explained they were coming from "Coley's." At the police station he called the Wallace house, and told the person there, "they got me on the way home"; "a little grass"; and "contact Coley, see what he can do." Later, after speaking to an attorney who called the station, he told Joyce Car-michael, "I got in touch with Coley and he got an attorney." Vehicles registered to Joyce Carmichael were observed at Wallace's home or at Cranland Airport on ten occasions in 1978 and thirteen occasions in 1979. Fusco was observed driving on some of these occasions and Carmichael on others.

13. *Roger Alan Wendorf.* Wendorf's vehicle, registered in Florida, was observed at Wallace's home in 1977. He was subsequently identified, ac-cording to the DEA, as a suspected principal in the manufacture of PCP.

14. *Francis T. McMahon.* McMahon's New Hampshire vehicle was seen at Wallace's home on April 3, 1978. On June 11, 1978, McMahon was killed in a motor vehicle accident in Brockton. Officers discovered one half pound of cocaine, $1,000 cash and drug paraphernalia, including scales, in the trunk of his car. Wallace's phone number was found with McMahon's personal effects.

15. *Paul Volpe.* Volpe's vehicle was seen at Wallace's home in October, 1977. In April, 1978, Wallace's vehicle drove to Cranland Airport. While the car was still at the airport, Volpe's plane landed twice.

16. *Kenneth Cedar (aka Paul Casey).* Cedar's truck was observed at Wallace's home by the affiant four times in 1977, eleven times in 1978, and six times in April, 1979. In 1975 Cedar was arrested and charged with conspiracy to distribute class B and class D controlled substances.

17. *Michael Butkovitz.* When Butkovitz was arrested in 1977 by DEA agents in California, he had Wallace's phone number in his possession, and telephone records showed calls from Butkovitz to the Wallace residence. Butkovitz was shot and killed in 1979.

18. *John Souza.* Agents for the DEA arrested Souza in 1973 for selling cocaine. Six calls from his phone to Wallace's home had been placed immediately before his arrest.

19. *Alan David Kaufman.* Telephone calls were frequently placed from Wallace's numbers to Kaufman's phone in Miami and to his business in Boston. His automobile, bearing Florida plates, was observed at Wallace's home on October 29 and 30, 1979. Kaufman's record includes convictions for assault and battery with a dangerous weapon and operating an aircraft without a license.

20. *Charlene Eldridge.* Eldridge worked at a restaurant known to be the site of drug trafficking. At one point she returned from Florida, where she reportedly modeled jewelry for Wallace, and called Wallace. Her mother reportedly heard her say "I've got the stuff, yes, it's 100 percent pure." When her mother asked to see the jewelry, Eldridge said she could not remember the combination to her locked brief case. Eldrige is listed as the clerk of a Massachusetts corporation called "Pure Gold Limited," incorporated on August 25, 1977. Coleman Wallace is listed as president and treasurer. Eldrige's car was seen at Wallace's home on ten occasions during 1977 and 1978.

21. *Michael K. Erving.* Vehicles listed to Erving were observed at Wallace's home five times in 1976, once in 1977, and three times in 1979. Both Erving's and Joyce Carmichael's vehicles were at Cranland Airport on July 3 and 8, 1979.

B. *The Informant's Information.*

William Tobin apparently talked to Conroy in relation to an investigation of Wax (Par. 7), that Wax was a "runner" for Wallace and a dealer in marihuana and cocaine. He said that he himself had been an associate of Wallace's and had learned that Wallace was distributing marihuana and cocaine. He also implicated Martin Kopp and David Wiseman.

C. *Purported Pattern of Visits to Airport.*

Conroy notes that Wallace and some of his associates make frequent use of Cranland Airport and of small, privately owned aircraft. One airplane

observed and owned by Wallace and Risio; another was Volpe's. Passengers were transported from the airport to Wallace's home on numerous occasions. On one occasion (April 25, 1978) Volpe's plane buzzed the house before landing. Wallace's car left the house ten minutes later, and the officer followed it to Cranland Airport, where it picked up two people who had apparently just left the aircraft. One of them was carrying a large brown paper bag. The other carried a small wooden box.

From May 10 to May 18, 1978, Conroy observed a great deal of activity, with visits by vehicles registered to Cedar, McMahon, and Bongarzone, as well as several others. On May 18, Volpe's aircraft landed and something was transferred from the plane to a truck which was seen at Wallace's home ten minutes later.

### D. *Unaccounted-for Wealth.*

Wallace is listed as director and clerk of a landscaping business but observations from 1972 through 1979 disclosed no landscaping activity on his part. When asked, Wallace said he drove a truck for the Herald American newspaper. Wallace purchased his home for $42,000 with a downpayment of $8,400 and subsequently remodeled the house, adding a jacuzzi and sunken living room. Four vehicles are registered in his name; he is a part owner of an airplane; he went to Thailand in November, 1978, and purchased an unspecified amount of gold jewely while there; he spends $90 to $100 in phone bills monthly, and many of his toll calls are to associates described above.

### II. *The Meiggs Affidavit.*

In February, 1979, Wallace came to the Hanson police department to reapply for a license to carry firearms. Officer Meiggs asked Wallace about a gold ring he was wearing, and was told that Wallace was dealing in gold and expecting a shipment from Thailand. Wallace then invited Meiggs to his house. During this visit Meiggs noted the spotlights and three guard dogs. Meiggs, a licensed auctioneer, estimated the value of antiques he saw at $10,000 and noted large bookcases filled with expensive looking stereo and television equipment. Wallace pointed out a clock he said had cost a thousand dollars, and said he was planning another trip to Saipan and Thailand.

### III. *The Worrall Affidavit.*

Richard Worrall is a Hanson police officer who responded on August 5, 1979, to a call from a neighbor who thought she had heard a cry for help coming from near the Wallace home. When Worrall pulled into the driveway, Wallace called out to see what the officer wanted. Wallace came out to the cruiser to talk to Worrall. Worrall observed that Wallace was "drawn looking," had a white powdery substance around his nostrils, was sweating heavily and had a "mucous type matter" around his mouth and teeth. Wallace said, "[A]t first, I thought you were going to bust me," and

told Worrall that the United States Treasury Department was investigating him and had ruined his life-style by drying up the credit needed for his gold business. He said that someone must have tipped them off that he was a heavy drug dealer. He said he did not know why Treasury was involved, but at this point he would not even be able to "cop an ounce of grass without them knowing it." He said Treasury agents were sending out illegal summonses to his banks. Worrall believed, based on his experience in narcotics investigation, that Wallace was at this time under the influence of cocaine.